# CASES

### ARGUED AND DETERMINED

#### IN THE

# SUPREME COURT OF ILLINOIS.

JOHN CAMPBELL

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon November 22, 1895.*

1. CRIMINAL LAW—*what is sufficient proof of corpus delicti.* The corpus delicti may be proved, in a prosecution for murder, by presumptive or circumstantial evidence, where that is the best evidence obtainable; but great caution should be observed in acting upon it.

2. SAME—*rule as applied to infanticide—degree of proof to convict.* In a prosecution for infanticide the *corpus delicti* must be proved by the best evidence which is capable of being adduced, and such an amount and combination of relevant facts, whether direct or circumstantial, must be shown as establish the imputed guilt to a moral certainty and to the exclusion of every other reasonable hypothesis.

3. SAME—*extra-judicial confessions—how far accepted to establish guilt.* Where extra-judicial confessions are relied on to establish defendant's guilt, the *corpus delicti* must first be otherwise established, not, however, necessarily by direct evidence.

4. SAME—*testimony of accomplice alone may convict.* While a jury may convict upon the uncorroborated testimony of an accomplice, such testimony is to be subjected to the same tests applied to the testimony of other witnesses, and courts should proceed upon such testimony with great caution.

5. APPEALS AND ERRORS—*evidence deemed insufficient to support conviction on appeal.* A conviction for the murder, at its birth, of an illegitimate infant upon the uncorroborated testimony of the mother, who was a confessed accomplice and jointly indicted with the accused, will be reversed, on appeal, where the witness was ignorant and depraved, did not understand the nature of an oath or the consequences of swearing falsely, had strong motives to convict the defendant, had been promised immunity, had made former statements that her child was born dead, and where the denial of the crime by the accused was corroborated by several other witnesses who were present in the house.

WRIT OF ERROR to the Circuit Court of Hamilton county; the Hon. C. C. BOGGS, Judge, presiding.

John Campbell, the plaintiff in error, and Nancy Cook, the prosecuting witness, were jointly indicted at the February term, 1894, of the Hamilton circuit court, for the murder of the newly born babe of the said Nancy. Campbell alone was tried. He was convicted, and sentenced to imprisonment for fourteen years in the penitentiary, principally upon her testimony, there being little or no other evidence tending to fasten the crime on him. This writ of error was sued out to reverse that judgment.

At the trial Nancy Cook testified, in substance, as follows : My name is Nancy Cook. "Dick" is my nickname. I am twenty-seven years old. I am confined in jail. I was never married. I am the mother of three children. One, a boy nine years old, is living, and two are dead. Defendant is the father of my last child. It was born at the home of the defendant, in Hamilton county, Illinois, at about ten o'clock Tuesday night, in the last week of October, 1893, about seven months after I became pregnant. I do not know whether it was a boy or girl. I do not know whether or not it is living. I have never seen it. It might be living for all I know. I have never inquired about it. I never asked defendant about it. It was not named. I got acquainted with defendant thirteen or fourteen years ago, in Kentucky. I moved with him to Arkansas. I went with his family from Arkansas to

Indiana, and thence to Illinois. I have lived the last few years, sincle uncle died, with defendant. I kept house for defendant and his brothers, as one of the family, until defendant married, in June, 1893. I have lived in Hamilton county four years. I never had any beaux. I never had connection with others in this country. In September, 1893, I told defendant I was going to law him, and he said, "If you will never pester me when the child is born you shall never be bothered with it." We had no more talk about it. At about four o'clock of the afternoon previous to the night the child was born I went out to a barrel of water that was in a wagon to get some water for the fattening hogs, and I jumped out of the wagon and hurt myself. I had queer feelings and soon had pains. I helped defendant and Clark skinning and dressing a beef after getting hurt. I was feeling curious then. I saw the blood. Labor pains commenced about seven o'clock that evening. I was eating supper and doing up the work after the pains began. After supper I told defendant I was going to be sick and for him to get some one. He said to wait and see. He said he would after awhile, if I needed any one. Defendant and his wife, Henry Campbell, his brother, and Billy Williams and Jimmy Williams, his nephews, occupied the east room of the house that night, and I and my little boy the west room. There was only a partition of studding and ceiling, with a door, between the rooms. There were two beds in my room and three beds in defendant's room. My bed had a feather bed on top of a straw tick, and had two quilts, a blanket and white sheet. I had no oil cloth on bed. Defendant, his wife and the boys all went to bed about eight o'clock. I was in their room when they went to bed. After eight o'clock I undressed and went to bed. I left partition door partly open. I could see when I went to bed. I never got up after laying down on the bed, and did not go out of doors that night. I knew it was not time for the child to be born. I expected to have a

miscarriage. I was suffering. Soon after I went to bed my boy went out of doors. Defendant came through my room and asked me how I was getting along. He came through my room four or five times. He went out on back porch to get water, and made a fire in the stove and stood by the stove until the child was born. Defendant put on his shoes. He came to the bed and took it out a minute or two after it was born. It was born on an old quilt. I helped myself at delivering the child. No one helped me. I was in great pain and agony at time of childbirth. I felt the child move and heard a noise. It cried like it was getting its breath. I mean it made a fuss like crying. It made a fuss only once. I only heard the noise once, almost immediately after it was born. It moved. He raised the cover and took the child out of bed. It made no noise after he took it. It moved after he took it and made a fuss. He cut the cord before he took it. It did not move or make a fuss after he cut the cord. It kind o' cried directly after it was born and before it was separated. He took it out and wrapped it up. I saw him go out of the door with his back toward me. That was the south door. I lay with my head north and he went out at the south door. Not a word was said betwixt us. I had no idea what defendant was going to do with the child when he took it. The child was born naturally, but it come too quick. After defendant went out with the child he came back in about thirty minutes and asked if I wanted anything. I told him no, and he went to bed. My little boy was in bed with me when the child was born. He was asleep. Defendant made a fire next morning at about four o'clock and told me to tell his wife I had a chill. I got up at eleven or twelve o'clock next day. I told defendant's wife I had a chill. She went to her mother's that day. The after-birth came from me while she was at her mother's. I was walking around in the house and it dropped, and I picked it up and put it in the heating stove. After the after-birth dropped I lay

down awhile and then got up and got supper. The bed clothing did not get soiled. There was nothing on the sheets. There was nothing about the bed. I had on several undergarments. I had a talk with Thomas Campbell once. I did not tell him that it was just a little wad of something that came from me, and that there was no more life in it than a stick of wood. I told him John Campbell had accused me of concealing my child, and had kept Uncle Joe from going on my bond. I had a conversation with Sheriff Crouch. I never told him the child was born dead. The trouble between me and Mrs. Campbell was, she was jealous-hearted, and quarreled and kept up a fuss, and was determined to carry news betwixt me and John. She got mad at me first about Jimmy. I got mad at her because she had a high temper and would fuss and quarrel. I did not state on my trial before the justice of the peace what I stated here. I testified there. I don't have to tell to whom I first told it. I never told any one that I was going to swear against John Campbell. I told Van Winkle about it. I know I am charged with the murder of my child. Rosina Campbell did it. She got out a writ for that, I understand. Mrs. Campbell stated in court that I was in a family way. I understood they were trying me for the murder of my baby, and therefore I went before the grand jury to tell· them the true facts. I understand I am indicted for the murder of my baby. I did not harm it. He carried it out. I never saw the child. I only saw the bulk of it wrapped up in a quilt. When I got up I looked, and the sheet was not soiled. Nobody promised to dismiss my murder case if I would testify in this case. I did not tell this before, because I did not want to tell all I knowed. Van Winkle said I could acknowledge to it. I did not want to tell it before the justice of the peace. Defendant told me once that when the child was born he would take it where I would not see it. I never spoke to him since about it. Defendant said that if I thought I was going to be sick he would send for some

one. He came in and asked me if I wanted anything, and I told him no. That is all. I never could get a word of secret talk with him after that. I did not tell about this at my first trial. They did not ask me about it. I never got mad at defendant. He got mad at me. It was his wife that was the trouble. I don't think there would have been any trouble if he had not got any wife. His wife has stirred up trouble ever since she has been in it. I want to punish the one that helped to do the work. Mrs. Campbell kept trotting back and forth to her mother's. She went every morning. I do not know exactly what the nature of an oath is. I do not know the consequences of swearing a lie. I have no idea of any punishment but cross-examination. I do not know the nature of an oath. She further said, that before giving her evidence she heard the State's attorney say that her evidence should not be used against her on her trial; that she testified with that understanding and on advice of her counsel; that she understood that she was to be protected.

Other witnesses testified that in October Nancy Cook appeared to be pregnant; also that plaintiff in error had said that he believed she had had a bastard child and concealed it; also that he testified before the justice of the peace that on the night in question he heard a noise; that his wife called his attention to it and said, "Dick has got her baby," but that he replied that he thought it was a cat; that he always talked freely about it and told the same story; that search had been made but no trace of the child was found.

On behalf of defendant below Willie Williams testified: "I lived with defendant last October. Nancy Cook lived there. Henry Campbell, Jimmy Williams, I and Rosina Campbell lived there. I remember the night they killed the beef. Nancy Cook and her boy slept in the west room. John Campbell, Rosina Campbell, Henry Campbell, Jimmy Williams and I slept in the east room. We went to bed about eight o'clock. We had supper at

seven o'clock.  I had earache that night.  I went to sleep about nine o'clock.  My earache waked me about one o'clock.  I did not sleep any more that night.  About five o'clock in the morning John Campbell got up and went out about a minute.  I heard no noise in Nancy Cook's room.  We had breakfast next morning about six o'clock. I went to school.  About half an hour after I woke up at one o'clock, Nancy Cook got up and went out doors and stayed a little bit.  At that time John Campbell was lying in the bed.  I am John Campbell's nephew, and live with him.  I think it was Nancy Cook that got up and went out.  I am fifteen years old."

Henry Campbell testified:  "I am John Campbell's brother.  I lived with him last October.  I know Nancy Cook.  She is commonly called 'Dick' Cook.  She has been living in the Campbell family about fifteen years. I saw her down where we were killing beef.  We had supper at seven o'clock.  Nancy Cook and her boy slept in the west room.  Her boy is ten years old this month. Billy Williams had earache that night.  Between twelve and one o'clock Billy Williams waked me up crying with his ear, and I heard some one go out of Nancy Cook's room.  At the time I heard some one go out of her room, John Campbell, Rosina Campbell, Billy Williams, Jimmy Williams and I were all in the east room.  John Campbell and his wife were in bed together.  About an hour before I heard some one go out of her room John Campbell got up and got a drink.  He was gone about a minute.  Next morning Nancy Cook said she had a chill, and did not get up.  I am twenty years old.  The boy had earache the night we killed the beef.  When John Campbell went out to get a drink he had to go through the west room. I know John Campbell went out to get a drink.  I got up and made a fire next morning."

Monroe Crouch testified that he was the officer who brought Nancy Cook to jail, and he understood her to say on her way up that her child was born dead.

Thomas Campbell, a cousin of defendant, testified that Nancy Cook told him that when her child was born it was dead, and had no more life in it than a stick of wood; that if John Campbell and his wife swore they heard it cry they would swear a lie; that she said it was a little bunch of something.

Defendant below testified in his own behalf, and denied that he was the father of the child; denied that he was present or assisted when it was born, or had anything to do with it; denied that he took it away, or that he had seen it or disposed of it in any way; denied that he had had any conversation with Nancy Cook about it, and denied all other testimony given by her connecting him with the disappearance of the child. His testimony as to what occurred the night the child was alleged to have been born was substantially the same as that given by Willie Williams and Henry Campbell, except that he said: "After we went to bed we was lying there maybe an hour and a half. My wife heard something, and she said, 'Dick has got her baby.' I said, 'I guess not.' She said, 'I heard something like a baby.' I said, 'It may have been a cat.' She said, 'No, it went like a baby.' We lay still and didn't hear any more. We lay in bed and talked perhaps half an hour or longer. I then heard some one get up in the room she was in and go out. I did not know who it was."

Charles Martin and Lorin Biggerstaff testified, one that he had walked home with Nancy Cook from church, and the other that he went with her to a neighbor's, but that they had no improper relations with her. Thirteen witnesses were then called on behalf of the People to impeach defendant below as a witness, but of these only three testified that his general reputation for truth was bad. Plaintiff in error and Nancy Cook were each about twenty-seven years of age.

T. B. STELLE, for plaintiff in error:

It is a general rule not to convict unless the *corpus delicti* can be established,—that is, until the dead body can be found.   Bouvier's Law Dic. title "Corpus Delicti;" Best on Presumptions, sec. 201; Starkie on Evidence, 575.

The rule that the body must be found dead is adhered to with great strictness in the English courts.   *Hindmarsh's case*, 2 Leach, 571; Russell on Crimes, 682, note; 2 Phillips on Evidence, (2d ed.) Cowen & Hill's notes, part 1, p. 394, note 323; 3 Greenleaf on Evidence, (6th ed.) sec. 30, note.

The common law rule that the *corpus delicti,*—the fact of death,—must be proven by direct and positive testimony, is ably stated and illustrated in the following cases : *Ruloff* v. *People*, 18 N. Y. 179; *Evans* v. *Evans*, 2 Hagg. Ecc. 35; *Rex* v. *Clews*, 4 C. & P. 221; *People* v. *Wilson*, 3 Park. Crim. 199; *Regina* v. *Hopkins*, 8 C. & P. 591; *Commonwealth* v. *Webster*, 5 Cush. 295; *Taylor* v. *State*, 35 Tex. 97; *State* v. *Williams*, 7 Jones, (N. C.) 446.

The identity of the deceased and the identity of the accused may be established by circumstantial evidence beyond a reasonable doubt, but the *corpus delicti,*—the fact of the death,—must be proven by direct and positive testimony.    2 Hale's P. C. 39; *Boorns' case*, cited in Wills on Circum. Evidence, p. 63; *Green's case*, 14 St. Tr. 1311 ; 1 Greenleaf on Evidence, sec. 24.

MAURICE T. MOLONEY, Attorney General, T. J. SCOFIELD and M. L. NEWELL, of counsel, and ISAAC H. WEBB, State's Attorney, for the People:

According to the rule as it seems to be understood by the best modern writers, the fact of the death when the body cannot be found may be proved by circumstances. Burrill on Circum. Evidence, 680.

It may be inferred, says Wills on Circum. Evidence, 162, from such strong and unequivocal circumstances of presumption as render it morally certain and leave no

ground for reasonable doubt.    In illustration, the author cites the case of *Rex* v. *Hindmarsh*, 2 Leach, 569; Best on Presumptions, 202, 203.

The general rule, says the American and English Encyclopedia of Law, (vol. 9, p. 728,) is that the *corpus delicti*, taken as a whole, may be shown by any evidence which satisfies the jury beyond a reasonable doubt, whether it be direct or circumstantial.    This rule is upheld and sustained in *State* v. *Keeler*, 28 Iowa, 551; *Johnson* v. *Commonwealth*, 81 Ky. 325; *State* v. *Williams*, 7 Jones, (N. C.) 446; *McCullough* v. *State*, 48 Ind. 109; *Stocking* v. *State*, 7 id. 326.

Burrill on Circum. Evidence, 679, says: "To require the discovery of the body in all cases would not only be unreasonable and absurd in itself, but would seriously interfere with the cause of criminal justice." See, also, 3 Bentham on Judicial Evidence, 234; 2 Starkie on Evidence, 944; *United States* v. *Gibut*, 2 Sumn. 19; *Lancaster* v. *State*, 91 Tenn. 267; *St. Clair* v. *United States*, 14 U. S. 1002; Wharton on Crim. Evidence, secs. 325-327; Kerr on Homicide, 539, 540, 541.

Mr. JUSTICE CARTER delivered the opinion of the court:

As will be seen from the statement of the case, no direct or positive evidence was produced showing that the child of Nancy Cook was dead, or, if dead, that its death was caused by the criminal agency of plaintiff in error.    If Nancy Cook's testimony be taken as true, the child, though of premature birth, was born alive.    She testified that she felt it move and heard it cry; that it moved again when plaintiff in error cut the cord.    Whether it survived that operation or not the evidence is silent. But she testified that he was the father of the child, and had told her that if she would not pester him he would take the child where she would never be bothered with it or see it again; that he cut the cord and wrapped the child in the piece of quilt on which it was born, took it away, carried it out of doors between ten and eleven o'clock at

night, and returned in about half an hour afterward without it; that she never saw the child when it was born nor had she seen it since; that she did not know what he did with it, nor whether it was dead or alive; that he never gave any account of it; that she had no conversation with him about it and could never get a secret talk with him afterward.    Search was afterward made about the premises, by others, but no trace of the child or of its remains was ever found.    As a witness in his own behalf he denied all of the incriminating testimony given by her, and his testimony was, in some of its most material parts, corroborated by the testimony of other witnesses.    But the weight of the evidence will be discussed at another place.

Counsel for plaintiff in error contends, in the first place, that if it be taken as true that the accused did all that the prosecuting witness testified that he did do, the conviction must fail for lack of sufficient·proof of the *corpus delicti.*    It has been said that in murder the *corpus delicti* consists of two elements, viz., the fact of death, and the criminal agency of another as the cause of the death. (*Ruloff* v. *People,* 18 N. Y. 179; 4 Am. & Eng. Ency. of Law, 309.)    Counsel concedes that the identity of the deceased and of the accused may be proved by circumstantial evidence, or that, when the fact of the death of the person alleged to have been murdered is properly established, the criminal agency of the accused may be shown by any competent evidence, whether direct or circumstantial, but it is insisted that the fact of death must be established by direct or positive evidence, and cannot be established by indirect or circumstantial evidence.    It is contended that this was the rule at common law, and is therefore the rule in this State.    It is conceded on behalf of the People that this was the general rule at common law, but it is insisted that the rule was subject to exceptions, and that the rule itself has been modified and changed by the later authorities, and that now, by the great weight of modern

authority, it is established that the *corpus delicti* may be proved like any other fact—by presumptive or circumstantial evidence.

Lord HALE said: "I would never convict any person of murder or manslaughter unless the fact were proved to be done, or at least the body found dead, for the sake of two cases—one mentioned in my Lord Coke's P. C., cap. 104, p. 232, a Warwickshire case; another that happened in my remembrance in Staffordshire, where A was long missing, and upon strong presumptions B was supposed to have murdered and to have consumed him to ashes in an oven that he should not be found, whereupon B was indicted and convicted and executed, and within one year after A returned, being indeed sent beyond sea by B against his will; and so, though B justly deserved death, yet he was really not guilty of that offense for which he suffered." 2 Hale's P. C. 290.

Lord STOWELL, in *Evans* v. *Evans*, 1 Hagg. Con. 105, said: "When a criminal fact is ascertained, presumptive proof may be taken to show who did it,—to fix the criminal,— having there an actual *corpus delicti;* but to take presumptions in order to swell an equivocal and ambiguous fact into a criminal fact would, I take it, be an entire misapprehension of the doctrine of presumptions."

In *Regina* v. *Hopkins*, 8 Car. & P. 591, a young woman was indicted for the murder of her bastard child, alleged in some of the counts by drowning, in others by suffocation. The child had been put to nurse after its birth, and at the age of sixteen days she took it, as she said, to take to her father, who lived on the bank of the river Wye. She was seen with the child as late as six o'clock in the evening of April 8, but between eight and nine o'clock she arrived at her father's without the child. The body of a child was found in the river Wye, but did not correspond with the description of the child in question and was found not to be the same. Lord ABINGER, C. B., instructed the jury that the prisoner could not be called

upon by law to account for the child or to say where it
was unless there was evidence to show that it was actu-
ally dead.

Many other early cases are reported sustaining the
rule contended for by plaintiff in error.   In *Ruloff* v. *Peo-
ple*, 18 N. Y. 179, (decided by the New York Court of Ap-
peals in 1858,) the court reviewed the authorities on this
subject, and came to the conclusion, with one judge dis-
senting, that there could be no conviction of murder
unless there was direct proof either of the death, as by
the finding and identification of the body, or of criminal
violence adequate to produce death, and exerted in such
a manner as to account for the disappearance of the body;
that when the death is proved by direct evidence, the
criminal agency of the accused in producing the death
may be established by circumstantial evidence.   This, it
was there held, was the rule at common law, and it was
adhered to in New York by the courts until, at a later
period, a statute was enacted which prohibited a convic-
tion "unless the death of the person alleged to have been
killed, and the fact of the killing by the defendant, as
alleged, are each established as independent facts, the
former by direct proof and the latter beyond a reasonable
doubt."   And in *People* v. *Palmer*, 109 N. Y. 110, it was held
that the statute was simply declaratory of the common
law, and that it was not intended by the statute to so
change the rule as it existed at common law, as to require
that the identity of the deceased should also be proved
by direct evidence only.   In the opinion of the court in
that case, to show that it was not intended by the statute
to limit the proof of the identity of the deceased to direct
evidence, it was said in argument, that "a murderer may
always escape if only he shall so mutilate the body of
his victim as to make identification by direct evidence
impossible, or shall so effectually conceal it that discov-
ery is delayed until decomposition has taken away the
possibility of personal recognition; and it will follow

that the tenderness of the Penal Code has opened a door of escape to that brutal courage which can mangle and burn the lifeless body, and has put a premium upon and offered a reward for that species of atrocity." This argument would seem to be equally as forcible against the supposed rule that the fact of death can be proved only by direct evidence.

We are satisfied that the strict rule contended for by plaintiff in error has been modified by many authorities, and that the weight of authority now is that all of the elements of the *corpus delicti* may be proved by presumptive or circumstantial evidence. It was said by Jeremy Bentham, that "were it not so, a murderer, to secure himself with impunity, would have no more to do but to consume or decompose the body by fire, by lime, or by any other of the known chemical *menstrua*, or to sink it in an unfathomable part of the sea." (3 Smith on Judicial Evidence, 234.) In *King* v. *Burdett*, 4 Barn. & Ald. 95, (6 Eng. Com. L. 358,) BEST, J., said, in speaking of circumstantial evidence: "Until it pleases Providence to give us means, beyond those our present facilities afford, of knowing things done in secret, we must act on presumptive proof or leave the worst crimes unpunished. I admit, where presumption is attempted to be received as to the *corpus delicti*, that it ought to be strong and cogent." (See, also, Wills on Circumstantial Evidence.) In a copious note to *Rippey* v. *Miller*, 62 Am. Dec. 177, Freeman says: "But while it is established that the death of the person whom it is charged the prisoner has killed may be proved by circumstantial evidence, it is everywhere held to be necessary to prove this fact by the most convincing evidence that the nature of the case will admit of. In *Smith* v. *Commonwealth*, 21 Gratt. 809, it was decided that the death of the person charged to have been murdered must be proved by the most cogent and irrefutable evidence." And he there further says: "To require the discovery of the body in every case would

seriously interfere with the administration of justice. It is therefore clearly settled that the fact of death may be inferred from such strong and unequivocal circumstantial evidence as renders it morally certain and leaves no room for reasonable doubt." (Ibid. note to p. 184.) See, also, to the same effect, *State* v. *Williams*, 7 Jones' Law, (N. C.) 446; 78 Am. Dec. 248. In an elaborate note to this case, in which many cases are cited, at page 253 it is said: "Direct and positive evidence is unnecessary to prove the *corpus delicti*. * * * It may be proved by circumstantial evidence, if it be strong and cogent, and leave no room for reasonable doubt. * * * This rule is now clearly established, and it would be unreasonable to always require direct and positive evidence. Crimes, especially those of the worst kind, are naturally committed at chosen times, in darkness and secrecy. Human tribunals must therefore act upon such indications as the circumstances of the case present or admit, or society must be broken up. The cases just cited show that the jury may find a verdict of guilty upon circumstantial evidence, and that the *corpus delicti* may be proved by such evidence, as well as any other part of the case, and that this rule applies in cases of murder and manslaughter as well as in all other crimes." And at page 257 it is further said: "But of the various forms of criminal homicide, that of infanticide (by which is popularly understood the murder of a recently born infant for the purpose of concealing its birth) perhaps presents the greatest difficulties in the establishment of the *corpus delicti*. No universal and invariable rule can be laid down with respect to it. Each case must depend upon its own peculiar circumstances, and, as in all other cases, the *corpus delicti* must be proved by the best evidence which is capable of being adduced, and such an amount and combination of relevant facts, whether direct or circumstantial, as establish the imputed guilt to a moral

certainty, and to the exclusion of every other reasonable hypothesis."

To this general statement of the law we assent. So strict a rule as contended for by plaintiff in error would, as pointed out by many authorities, operate, and especially in cases of infanticide, to completely shield the criminal from punishment for the most atrocious crimes. The complete destruction of the body of a newly born infant might not be difficult. To say that in such a case, while every one would admit that the body could be completely destroyed by animals, by fire, or other destructive agencies, circumstantial evidence, though of the most cogent and convincing character, would not be admissible to show the fact of death, as well as the criminal agency of the accused in producing it, would be to say that there is a class of the most atrocious crimes which, when committed in secret, as most crimes usually are, and by persons of sufficient capacity and skill to destroy the body, must go unpunished, because the law has closed all avenues but one leading to detection, and has permitted the criminal himself to close that one. We are not prepared to so hold. It is, however, familiar law, and frequently recognized by this court, that extra-judicial confessions of the commission of crime, where such confessions are relied upon to establish guilt, are not sufficient to authorize a judgment of conviction without other sufficient proof of the *corpus delicti*, but that the *corpus delicti* should first be otherwise established, not, however, necessarily by direct evidence only. *Andrews* v. *People*, 117 Ill. 195; *Williams* v. *People*, 101 id. 382; *South* v. *People*, 98 id. 261; *May* v. *People*, 92 id. 343; *Bergen* v. *People*, 17 id. 426; *Gray* v. *Commonwealth*, 101 Pa. St. 380; 47 Am. Rep. 733; *State* v. *German*, 54 Mo. 536.

It is undoubtedly true that where there is no direct or positive evidence of the death of the person who is charged to have been murdered, great caution should be observed in acting upon presumptive or circumstantial

·evidence; but that the fact of death may be so proved, when it is the best evidence obtainable, we have no doubt. It would unnecessarily extend the length of this opinion to review the authorities at length.   Many of them will be found cited in the notes to the following cases :   *State v. Williams*, 78 Am. Dec. 248, and *Rippey v. Miller*, 62 id. 177. See, also, 4 Am. & Eng. Ency. of Law, 309, and notes; 9 id. 728;  Burrill on Circum. Evidence, 680 ; Kerr on Law of Homicide, 539;  Wills on Circum. Evidence, 179;  Wharton on Crim. Evidence, secs. 325, *et seq ; United States v. Gibut*, 2 Sumn. 19 ; *State v. Keeler*, 28 Iowa, 551 ; *Johnson v. Commonwealth*, 81 Ky. 325 ; *Stocking v. State*, 7 Ind. 326 ; *McCollough v. State*, 48 id. 109 ; *Lancaster v. State*, 91 Tenn. 267 ; *Gray v. Commonwealth, supra.*

We have examined the record with much care, and cannot find that the trial court committed any error in the admission and exclusion of evidence, or in giving or refusing instructions to the jury.   Complaint is made by plaintiff in error of the ruling of the court respecting the instructions, but we find no error in this respect.   The instructions applicable to both sides of the case were full, and unusually free from error.

The only question remaining to be considered is whether or not the evidence is sufficient to sustain the judgment.  While it is the province of the jury to determine what weight should be given to the testimony, and whether or not the testimony of any particular witness should be believed or not, and while the trial judge and the jury have better facilities for coming to a correct conclusion upon all such questions than we possess, still the responsibility is at last cast upon this court, when the question is presented, as it is here, to determine whether or not the evidence contained in the record is sufficient to support the judgment of conviction.   The record contains but little circumstantial evidence tending to establish the guilt of plaintiff in error.  The facts and circumstances proved, independently of the direct testi-

mony given by Nancy Cook, were as consistent with the
theory that the child, whether dead or alive, was dis-
posed of by her as that it was murdered by him with her
consent and connivance, so that at last the conviction
must stand or fall upon her own uncorroborated testi-
mony. When she testified she was in jail, jointly indicted
with him for the alleged murder. By her own testimony
she was a willing accomplice. It is true that judgments
of conviction of crime may be properly based upon the
uncorroborated testimony of an accomplice, and this
court has frequently so held; but it has always been said
that in such cases trial courts should proceed with the
greatest caution. *Hoyt* v. *People,* 140 Ill. 588; *Friedberg* v.
*People,* 102 id. 160; *Earll* v. *People,* 73 id. 329; *Cross* v. *People,*
47 id. 152; *Gray* v. *People,* 26 id. 344; *Collins* v. *People,* 98
id. 584.

In *Hoyt* v. *People, supra,* Mr. Justice SCHOLFIELD said
(p. 595): "But the authorities agree, and common sense
teaches, that such evidence is liable to grave suspicion,
and should be acted upon with the utmost caution, for
otherwise the life or liberty of the best citizen might be
taken away on the accusation of the real criminal, made
either to shield himself from punishment or to gratify his
malice."

It will be noticed that in the great majority of the
cases where this question has arisen for discussion, the
testimony of the accomplice was corroborated by other
evidence, direct or circumstantial. Still it is undoubtedly
the rule in this State, as stated in *Rider* v. *People,* 110 Ill.
11, that "whatever the law may be in other States with
respect to the right of a jury to convict upon the uncor-
roborated testimony of an accomplice, it is well settled
the right exists here, and convictions upon such testi-
mony will not be disturbed by this court on that ground
alone." In addition, however, to the suspicion which
must attend the testimony of an accomplice, it is, of
course, to be subjected to the same tests which are applied

to determine the reliability and force of the testimony of other witnesses. In the case at bar, the accomplice, upon whose unsupported testimony the plaintiff in error was convicted of the murder of her newly born babe, was an ignorant and depraved woman, who did not know the nature of an oath, and had no conception of any punishment to which she would subject herself for testifying falsely. It is evident from the testimony that she felt that she had been greatly wronged by the marriage of the plaintiff in error, and was exceedingly jealous of his wife, whom she accused of trotting back and forth carrying stories to her mother, and of being the cause of all the trouble. At a time previous to her trial she had been arrested on the complaint of the wife of plaintiff in error for concealing the death of her bastard child, and on the examination testified as a witness in her own behalf, but did not, in such testimony, in any way implicate plaintiff in error in the disappearance of her child. She had told Thomas Campbell, a witness for the defendant, (if he is to be believed,) that the child was born as dead as a stick of wood, and that if John and his wife testified that it was born alive they would swear to a lie; that it was only a little wad of something, and had no life. She complained to this witness that plaintiff in error had prevented her from getting bond and being released from custody. Monroe Crouch, the officer who arrested her, testified that as he remembered her statements to him she said the child came dead. She stated, when on the stand, that she understood from what had been said to her or in her presence, that if she testified for the People her testimony would not be used against her and that she would be protected—that she testified with that understanding. We think it clear that this woman had the strongest motives that could operate upon the human mind to so testify as to inculpate the plaintiff in error and exculpate herself, —to obtain her own release and freedom from punishment

and at the same time strike a blow at those whom she thought had wronged her.

It may, however, be said that this was a question for the jury—that it was for them to say whether the witness was worthy of belief or not; and that this court, in accordance with uniform precedents, will not interfere in such a case to set aside the verdict of the jury. In this case, however, the attendant circumstances, with so many persons in such close proximity, as testified to by her, tended to weaken such force as her testimony might otherwise have. Besides, other witnesses, including plaintiff in error, gave testimony contradicting the testimony of the prosecutrix as to what he did on the night in question, which testimony, if true, left no evidence upon which a verdict of guilty could be sustained. The evidence showed that while she made contradictory statements in and out of court, the defendant told the same story from the beginning. There is doubtless a possibility of his guilt, but we are constrained to say that the evidence is insufficient to establish his guilt beyond a reasonable doubt. We think it would be establishing a precedent fraught with much danger to sustain this judgment upon the evidence set out in this record. Upon another trial other facts and circumstances may possibly be shown which may tend to' dissipate the doubts which must arise in any candid mind upon reading the evidence as now presented.

The judgment of the circuit court is reversed and the cause remanded to that court.

*Reversed and remanded.*