## JAMES CONLEY

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1897.*

1. CRIMINAL LAW—*uncorroborated testimony of accomplice should be acted upon with great caution.* While the uncorroborated testimony of an accomplice may be sufficient to sustain a conviction, yet it is liable to grave suspicion and should be acted upon with the utmost caution.

2. SAME—*fact that a co-defendant was promised immunity should be considered in weighing testimony.* The fact that a co-defendant in an indictment for murder was given express assurance that she would not be punished if she would testify against her co-defendant is a circumstance to be considered in weighing her testimony.

3. SAME—*effect where immunity is promised by relative in presence of attorney for the State.* The fact that a promise of immunity is made to a co-defendant, a woman of weak mind, by her uncle, in the presence of the assistant prosecuting attorney, who neither repudiates nor explains it, does not lessen the force of the promise as tending to affect the credibility of her testimony.

4. SAME—*when conviction for murder on uncorroborated testimony of co-defendant cannot be sustained.* A conviction of a person for murder, on the ground that he advised the crime of killing an illegitimate child, though not present, cannot be sustained upon the uncorroborated testimony of his co-defendant, the child's mother, who committed the crime, where the latter is so insane at the time of the trial as to be incompetent as a witness and her testimony is wholly contradicted by the party convicted.

5. WITNESSES—*one mentally incapable of understanding an oath is not a competent witness.* One who is so deficient in understanding as to be incapable of comprehending the nature and obligation of an oath is not a competent witness.

WRIT OF ERROR to the Circuit Court of Edgar county; the Hon. F. BOOKWALTER, Judge, presiding.

H. S. TANNER, and J. W. HOWELL, for plaintiff in error.

EDWARD C. AKIN, Attorney General, (D. C. HAGLE, C. A. HILL, H. H. VAN SELLAR, State's Attorney, and FRANK T. O'HAIR, of counsel,) for the People.

Mr. JUSTICE WILKIN delivered the opinion of the court:

At the March term, 1897, of the Edgar circuit court plaintiff in error, James Conley, and Bertha Wilson were jointly indicted for the crime of murder, the charge being that they caused the death of the illegitimate child of said Bertha by strangling. They each entered the plea of not guilty, and were tried together at the same term of court to which the indictment was returned. The verdict of the jury was that the defendant Bertha Wilson committed the act charged in the indictment, but was at the time a lunatic or insane person, and that she had not entirely and permanently recovered from such lunacy or insanity. The judgment of the court as to her was that she be taken to the hospital for the insane, as provided by the statute in such cases. The defendant Conley was found guilty in manner and form as charged in the indictment, and his punishment fixed at imprisonment in the penitentiary for a term of fourteen years. Motions for new trial and in arrest of judgment were overruled and judgment entered upon the verdict, to reverse which this writ of error is prosecuted. The only ground of reversal insisted upon is that the conviction was not justified by the evidence.

There is no controversy as to the fact that on the 10th day of March, 1897, Bertha Wilson was delivered of an illegitimate child at her father's house, in Edgar county, this State, which child was the same day found dead, concealed in a trunk in her room, with an apron-string drawn and tied tightly around its neck. So far as the evidence discloses she was alone, wholly unattended, at the time of its birth, and that her father and other members of the family, although sleeping in the same house, knew nothing of the birth until the arrival of a physician some hours later. The girl was about twenty-one years of age. Her mother had been dead for several years, and she and four brothers and one or two sisters lived with the father as a family, but whether all the other children

were at home that morning does not appear. Her father, John Wilson, testified as follows: "On or about the 10th of last March I got up about four o'clock in the morning and made the fires. She came to my room and said she felt sick to the stomach. I said, 'Had I better go for the doctor or anybody?' She said it would wear off, and she sat down in the rocking chair until half-past four, and I got up again and laid on the bed within about a foot of her. I got up and went in the dining room, made up a fire and got breakfast. She said she would get breakfast, but she didn't get any better. I waked up the two boys and we ate breakfast. She still sat in the rocking chair. They took their axes and I done up the dishes. I gave her some coffee. She said she felt better and I went over to camp. I told a fellow to send his wife over, I wanted to go for a doctor. When the doctor came she said she had been pregnant. She told me what had occurred, and we examined the house and found it in the trunk. She did not tell me who the mother of the child was. She would not talk to me about it. She was within ten feet of me, and I didn't hear nothing of the crying or anything else, and the two boys were present with me at the time." Dr. Darby, a witness for the People, testified he had known the defendants, Conley and Bertha Wilson, since their births; that he called on Bertha on March 10, 1897, and found she had been pregnant and delivered of a child, with the afterbirth undelivered; that he made further investigation and found the child in a trunk, with an apron-string around its neck; that he thought its death was caused by strangulation, as the string was tied tight enough to strangle it; that no person can live with a cord as tight as that was around its neck; that there was nothing about the child by which he could tell whether or not it had been born alive. The evidence shows that plaintiff in error, Conley, was acquainted with Bertha Wilson; that he had visited her at her father's house, and had sometimes taken her to church and to neighbors'

houses; that this attention to her had extended back for a year or more prior to the birth of her child.

The State relied upon the testimony of Bertha Wilson alone to connect plaintiff in error with the crime. On the first day of the trial the prosecution called her as a witness, but upon the court's explaining to her that she was not compelled to testify, she availed herself of her right and refused to do so. On the following day she was again called by the prosecution, and upon this occasion was willing to testify for the State. On cross-examination she said she had talked with her uncle,— one of the prosecuting witnesses,—and the assistant prosecuting attorney, and that the latter had urged her to testify. Robert Wilson, the uncle referred to above, testified regarding the conversation mentioned by her, that Bertha was to take the stand, and that he had said "they wouldn't say one word against her; there would be nothing against her; that it would be on Mr. Conley." This conversation appears to have been made in the presence of the assistant prosecuting attorney, and as a part of the conversation in which the latter urged her to testify.

Bertha testified that plaintiff in error was the father of her child; that he had said for her to kill it as she did do; that if she did "not do that he would choke me or lay it out;" that she "was down at his house and he came a piece with me, when he told me to kill it as I did." This was the substance of all her testimony as to Conley's guilt. Plaintiff in error testified that he knew Bertha a long time; that he had kept company with her some; that he had never had sexual intercourse with her at any time, and that there was never any conversation between them about her child, nor what should be done with it if a child were born.

There was a conflict between the testimony of plaintiff in error and that of the witness Robert Wilson, uncle of Bertha, as to a conversation had between them the

day after the coroner's inquest.  The testimony of Robert Wilson on this point was as follows: "I was in the sugar camp the day following the post mortem, when James Conley came.  Well, we talked a little bit, and after awhile, after we had talked perhaps five or ten minutes, I said to him: 'You and Bertha has caused right smart of trouble; looks like there will be ――― in this neighborhood.'  He said: 'What's that?'  I said, 'She has had a child.'  I said, 'It will cause a good deal of trouble; you might be the cause of it, for she has had a child and it's killed or it's dead.'  ·He said, 'Is that so?'  I said, 'Yes, it 'tis,' and he says, 'Did she kill it?'  I said, 'I suppose so; that is what I understand from the coroner's jury—that she killed the child.'  'Well,' he said, ·I am sorry of that.'"  At another time the same witness, referring to this same occasion and the reply made by Conley, said: "He stood a minute, and said he was sorry she gave herself away in that way; why didn't she run against something, or fall down and hurt herself."  The plaintiff in error, on the witness stand, denied making the last remark but admitted the occasion of the conversation.

Fourteen witnesses who had known Bertha for many years were placed upon the stand in her defense, to show the condition of her mind, and practically all gave the same testimony, which was to the effect that she did not have mental capacity sufficient to distinguish between right and wrong.  No attempt was made by the State to rebut this evidence.  John Wilson, father of Bertha, testified as to her understanding, as follows:  "From my observations her mental capacity is not as good sometimes as at others.  She is subject to spells.  The doctors think it palpitation of the heart.  Well, she falls down and lays through a spasm.  There are times I don't really think she knows what she is talking about in some things, and it comes on in spells.  They occur sometimes once a month.  When these spells are on her I don't think she knows right from wrong.  After she has these spells she is weak and

feeble and very nervous." On cross-examination he said: "One spell she had lasted two weeks. They usually last three or four days. When she is over these spells she aims to tell mighty near the truth. So far as I know she aims to tell the truth to me. So far as I know she is honest as anybody at certain times. I couldn't tell whether a person of stronger mind could persuade her to do things. I couldn't tell that far." When questioned as to whether she had a spell on the day of the trial he said: "Why, she isn't clear on it, but she has the touch of one of these spells now. On the day of the inquest I don't think she was at herself. I suppose she had a spell. She is all quivering. Her mother before her had them spells, and probably laid eight hours—one time laid twelve hours. I have lived with my children since the death of my wife, ten years ago. If she (Bertha) was under the influence of one of the spells, what she would state of a fact or circumstance would not be worth noticing."

The theory of the prosecution upon the trial was that plaintiff in error, James Conley, was an accessory to the crime before the fact, having advised and encouraged its commission, not being present. If he was such accessory, he was, by the terms of the statute, indictable and punishable as a principal whether Bertha Wilson was convicted or amenable to justice or not. (Hurd's Stat. 1897, chap. 38, sec. 3, p. 602.)

The only testimony we have been able to find in this record tending in any way to connect plaintiff in error with the crime charged is that of his co-defendant, Bertha Wilson. We are also convinced, after a painstaking examination of all the evidence, that if the conviction of James Conley is sustained it must be upon her unsupported and uncorroborated testimony. While it is the law of this State that the unaided evidence of an accomplice or co-defendant will sometimes sustain a conviction, the court may, in its discretion, direct the jury not to return a verdict of guilty on such uncorroborated testimony.

We said in *Hoyt* v. *People*, 140 Ill. 588 (on p. 595): "But the authorities agree, and common sense teaches, that such evidence is liable to grave suspicion and should be acted upon with the utmost caution, for otherwise the life or liberty of the best citizen might be taken away on the accusation of the real criminal, made either to shield himself from punishment or to gratify his malice,"—citing Phillips on Evidence, page 111, where the author says: "Accomplices, upon their own confession, stand contaminated with guilt.   *   *   *   They are sometimes entitled to even a reward upon obtaining a conviction, and always expected to earn a pardon." See, also, Best on Evidence, p. 266, sec. 170, to the same effect.   We also held in the later case of *Campbell* v. *People*, 159 Ill. 9, that while a jury may convict upon the uncorroborated testimony of an accomplice, such testimony is to be subjected to the same tests which are applied to the testimony of other witnesses, and courts should proceed upon such testimony with great caution; and we there reversed a judgment of conviction, as we had done in the *Hoyt case*, on the ground that the evidence of the accomplice was not sufficient to authorize the verdict of guilty.

There are several reasons why the testimony of Bertha Wilson is entitled to but very little weight, and one which entirely destroys it as evidence.   In the first place, she testified not only with the expectation "to earn a pardon," but under the express assurance that she would not be punished if she would testify.   It is true that promise or assurance came directly from her uncle, but it was in the presence of one of the attorneys for the People and was in no way repudiated or explained, and to one of her mental capacity the assurance, being given by the uncle, had perhaps greater influence upon her mind than it would have had if given by the attorney directly.   This is in no sense a reflection upon the action of the attorney, but to indicate the weight to be given the testimony of the witness.   The evidence of her father is to the effect

170—38

that under certain circumstances and conditions of her health she was untruthful or unreliable in her statements. Her testimony is of the most meager and unsatisfactory character, and was generally given by way of answers to direct and suggestive questions.

But, aside from the unreliability of the statements of Bertha Wilson from these considerations, she was clearly an incompetent witness. How can it be consistently said that she was a lunatic or insane person to the extent that she could not distinguish between right and wrong, and therefore not amenable to the law for her criminal acts, and yet be a competent witness? The finding of the jury was, that at the time of the trial she was a lunatic or insane person. This verdict was based upon the testimony of many witnesses who swore that in their opinion she was incapable of distinguishing between right and wrong. Therefore the force and obligation of an oath could have no influence upon her. It is absurd to say that she was so far lunatic or insane as to be irresponsible for her acts, and yet maintain that her co-defendant may properly be convicted on her testimony as a witness. It is not pretended that the verdict of the jury as to her mental condition was not justified by the evidence. The court acted upon that verdict and sent her to an insane hospital. We think her own testimony on the stand and her conduct upon the trial give strong evidence of her want of mental capacity. Persons deficient in understanding to the extent of being incapable of comprehending the relation and obligation of an oath are not competent witnesses. (1 Greenleaf on Evidence, sec. 365.) The author there says: "The repetition of the words of an oath would in their case be but an unmeaning formality."

Without giving weight and credence to the testimony of Bertha Wilson it is not claimed the conviction of plaintiff in error can be sustained. He positively denied his guilt and that he was the father of the child or that he at any time had improper relations with its mother, and

we find no substantial ground in the evidence to discredit him. It may be possible that he is guilty, but there is, in our opinion, no competent proof in this record of the fact.

The judgment of the circuit court will be reversed, and the case will be remanded for another trial in conformity with the views here expressed.

*Reversed and remanded.*