(No. 22072.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN SAMARAS *et al.* Plaintiffs in Error.

*Opinion filed February 23, 1934.*

EUGENE L. MCGARRY, ANTHONY CALIENDO, and G. J. DEVANNA, for plaintiffs in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

On July 14, 1932, an indictment was returned in the criminal court of Cook county charging Peter Tjenos, Louis Samaras and John Samaras with murder. The indictment consisted of one count, and charged that the assault was made upon the deceased, John Protopapas, by means of arson. It alleges that the defendants Louis Samaras and John Samaras unlawfully murdered the de-

ceased, because, as the indictment says, while they were engaged in the pursuit of a certain felonious intent (arson, in the burning of a certain building,) Protopapas and divers other human beings were in the building, and that by reason of the burning of the building Protopapas, who was then therein, received mortal burns causing his death. It further alleges that the defendants, when they set fire to and burned the building, well knew that Protopapas was in the building and well knew that it was then usual and customary for other human beings to be in the building, and that the arson constituted an act and felony which as its consequence naturally tended to destroy the life of any human being who might be in the building. The cause was tried in the criminal court of Cook county, resulting in a verdict finding Louis Samaras and John Samaras guilty of manslaughter in manner and form as charged in the indictment. Motions for a new trial and in arrest of judgment having been made and overruled, the record is brought to this court for review upon writ of error.

Inasmuch as this case must be decided upon the facts, we will summarize the evidence in its aspect most favorable to the State.

The record shows that in the building burned the defendants conducted a confectionary store and restaurant, being 3156 Fifth avenue, in the city of Chicago, the rear of the store extending back on Kedzie avenue and numbered 133 Kedzie. In the early morning of June 6 an explosion and fire took place in the premises. The fire was of the "flash" type, and the evidence shows it to have resulted from the ignition of gasoline or other volatile oil or fluid within the premises. The windows were blown across the street and the fire shot out of the windows across the street and up as high as the third floor. The evidence of the chief of the fire battalion in charge of this fire, the evidence of various firemen and representatives of the fire marshal's office all established this fact with reasonable certainty.

The fire alarm was received at 2:29 A. M. and the fire department arrived about four minutes later. It had the fire under control in twenty-five or thirty minutes, and when firemen got inside the back door, which opened onto Kedzie avenue, they found a man lying inside on the floor burned beyond possible recognition but identified with more or less certainty as being Protopapas. This identification was made by his wife, who testified that she had seen him alive on the evening before at 623 South Halsted street, in Chicago. She made the identification by a jaw-bone and a piece of shirt about three inches square, testifying that the jaw was recognizable by having a tooth missing and a filling in the tooth next to it, and claimed she recognized the cloth of the shirt. She testified she was not living with her husband but that he called on her occasionally, and that he had no home except "wherever he might hang his hat," as she expressed it, and that he had been evicted from several places. She testified that he was five feet eleven inches tall and weighed about 135 or 140 pounds. The coroner's physician testified that the body of the deceased was five feet eight inches long and weighed approximately 160 pounds. This coroner's physician gave it as his opinion that death was caused from second and third degree burns, second degree burns being those which penetrate the skin and third degree burns being those which go down to and involve the bone. It must be noted at this point that this is the only evidence in the record concerning the deceased. There is no further evidence of anyone seeing him at any other time or place, nor any connection, or even acquaintance, shown between him and either of the defendants. Neither does it appear that he was ever in their place of business or had any contact of any kind with them.

It was proved by an oil station attendant that about 11:30 o'clock on the evening of the fire an unidentified man with a sack stopped at his oil station, about three

blocks from the scene of the fire, and purchased five gallons of ethyl gasoline. The sack contained a five-gallon can. This sack and five-gallon can were found at the scene of the fire shortly after the explosion, being found in an alley or passageway at the rear of the premises. The oil station attendant who sold the gasoline testified that he had a rough idea of the man's appearance but did not take a good look at him; that he was five feet eight inches tall and weighed between 140 and 160 pounds, was dark complected, and that he wore a top coat on the night of June 5, 1932. He further testified that he never saw a man of that description thereafter; that he viewed the corpse at the undertaker's but could not say whether that was the man but that he was of the same height. His testimony makes it clear that the person who purchased the gasoline was neither one of the defendants in the case, as he was confronting them in court at the time of his testimony and testified that he had never seen a man of that description thereafter. Although his testimony leaves the possibility that it may have been the deceased who bought the gasoline, it is altogether too vague to be considered proof of it.

The only evidence tending to connect the defendants with the intentional burning of the store may be summarized as follows: It was proved they had $8000 fire insurance soon to expire and that they had placed $3000 of other insurance on the premises for a term of one year, the policy being taken out about three months prior to the fire. It was shown their business was not prosperous and that they were heavily in debt, and that John Samaras had placed a chattel mortgage in the sum of $5000 against the business or a part of it. Louis Samaras was seen about 1:00 o'clock in the morning prior to the fire sitting in his store with only a dim light burning, and the witness who saw him testified that it was usual for him to be open for business at that time on a Sunday night. The same

witness (a neighbor who lived near the premises) testified that he passed the place of business about 1:00 o'clock and saw Louis in there, as above stated, then went to bed about 1:30 in his home next door; that shortly thereafter he heard someone coming down the gangway, which is at the rear of the defendants' back porch, and that he heard this person bump against a barrel of broken glass and heard a sound as though someone was putting down a can; that shortly thereafter he was awakened by the explosion and fire, and that afterward he went out in front and saw Louis there, fully dressed. This witness further testified that he spoke to Louis about 2:45 A. M., which would be about fifteen or twenty minutes after the fire, and that Louis wanted witness to take him out to his brother's place on River road; that later on he failed to see Louis and went around to the rear of the building, where he found a sack; that he picked it up and found a can near the barrel of glassware above mentioned; that there was red, high-test gas on the top of the can, and that the can and sack introduced in evidence were similar to the articles found by him. He further testified that about a week before the fire Louis had told him how bad business conditions were, and that he thought he would have to go out of business if it did not get better. Another witness, Louis Fantess, testified that between five minutes before 2:00 and a quarter after 2:00 on the morning of the fire he had seen Louis talking to the watchman of the Cadillac Motor Company's premises, two doors north of the place of the fire, and that Louis was fully clothed. This witness testified that he saw the explosion, and that he saw Louis during the fire and asked him what the matter was, and he said, "Look at it!" Another witness, John DelSandro, testified he saw Louis in a restaurant across the street shortly after the fire, and that a man by the name of Lencilli talked to Louis and cursed him, and, applying a most opprobrious epithet, said, "You almost burn me and my family," and that Louis did not

answer him but appeared nervous. Lencilli was not called as a witness. There was also evidence tending to show that shortly before the fire, early in June, a man by the name of Cook, who was employed in the Newman hardware store, had made a key for John Samaras for a lock similar to the lock on the Kedzie street door of the store, whereas at the coroner's inquest John and Louis both declared they had not had any key made just prior to the fire, and John testified that he had a key made two months previously, which he turned over to Louis. Louis said he only had one key, made three years before.

This is the substance of all of the evidence in the case, in so far as there is any evidence tending to show any guilt on the part of the defendants or either of them. The evidence for the defendants will not be mentioned, nor will any of the other matters complained of as to instructions, receipt or rejection of evidence, etc.

The evidence does not sustain the charge as to the defendant John Samaras. There is evidence tending to show he had a key made for a Segal lock, similar to the one on the rear of the premises, shortly before the fire. He is mentioned as having given a chattel mortgage on his interest in the business and as having secured $3000 of insurance, but whether this was in connection with the chattel mortgage or not is not shown. Even the argument for the State fails to advance any theory upon which he could be held guilty upon this record.

As to the defendant Louis Samaras there is much more evidence in the record than as to his brother, John, but it falls far short of proving him guilty beyond a reasonable doubt of the crimes charged in the indictment. There is no evidence in the record that either one of the defendants associated with the deceased, was acquainted with him, or even that either one of them ever saw him. There is no evidence that either one of them set fire to the property or caused it to be set afire, and there is only the circum-

stance of their heavy indebtedness and their insurance to indicate a motive for setting fire to the building. As to any motive for destroying the deceased there is not the slightest hint in the record. But little more can be said of the evidence against Louis than that he was in the neighborhood at the time of the fire and therefore had an opportunity to commit the crime. He lived in the neighborhood, however, practically next door to the building, and there is nothing strange or suspicious about his being there at that time.

The State suggests in its argument that it is a fair inference that the man who was burned to death inside had gone in there, saturated the place and set it afire at the connivance of the Samaras brothers, and that they had locked him in there with the hope not only of burning the building and collecting the insurance but of destroying the only witness to their act. There is no authority cited permitting us to indulge in such an inference if we were so inclined, and certainly we cannot do so. It would be an equally fair inference to assume that the incendiary who set the place on fire after saturating it with gasoline was killed by the ensuing explosion, which slammed the door shut and locked it.

It is undoubtedly true, as argued by the prosecution, that guilt may be shown by circumstantial evidence and that direct evidence need not be produced. It is also true, however, that when circumstantial evidence is relied upon for conviction the circumstances proved must be sufficient to establish the guilt of the defendant beyond a reasonable doubt. *Campbell* v. *People,* 159 Ill. 9; *Dunn* v. *People,* 158 id. 586; *People* v. *York,* 262 id. 620.

The judgment of the criminal court of Cook county is reversed and the cause remanded.

*Reversed and remanded.*