## Commonwealth v. Walters.

(Decided December 12, 1924.)

### Appeal from Lyon Circuit Court.

1. Conspiracy—Criminal Law—Mere Intent to do Unlawful Act Not Indictable, But Only Agreement to Carry it Into Execution.—The design to do an unlawful act, or a lawful act by unlawful means, is not indictable, where resting in intention only; but, when two or more agree to carry it into execution, the very plot is an act in itself constituting an indictable public offense.

2. Homicide—One Assisting in Conspiracy to Assist Escape from Prison, Resulting in Murder, Guilty of Murder.—Where wife of life prisoner participated in conspiracy to assist him in escaping from penitentiary, which constituted felony under Ky. Stats., sections 1232, 1239, 1357, 2239, 3806, and furnished him with pistols to aid him in escaping and, in effecting escape, murder was committed, held, that wife was guilty of murder; fact that he promised not to use pistols in escaping not being defense, but merely a mitigating circumstance.

3. Conspiracy—Conspirators Guilty of all Acts Resulting from Conspiracy which were Natural Results Thereof.—When individuals associate themselves in an unlawful enterprise, any act done in pursuance of conspiracy by one is the act of all, and extends to such results as are natural or probable consequences of such acts, even though such consequences were not specifically intended as part of original plan.

FRANK E. DAUGHERTY, Attorney General, C. C. MOLLOY, DENNY P. SMITH, J. H. COLEMAN and WOOTTON, SMITH & WOOTON for appellant.

C. C. GRASSHAM for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON—Certifying the law.

The indictment accused appellee, Lillian Walters, of the crime of "accessory before the fact" to the willful murder of Hodge Cunningham, arising out of the riot which occurred at the Eddyville penitentiary on the 3rd of October, 1923, when several persons lost their lives.

A trial resulted in an acquittal of appellee Walters, and this appeal is prosecuted by the Commonwealth for a certification of the law, appellee being defendant in two other similar indictments.

Appellee, Lillian Walters, was the wife of Monte Walters, a life prisoner in the Eddyville penitentiary at the time and before the riot and, who, to make his escape, precipitated it by killing one or more guards and otherwise terrorizing the officers at the prison as well as the inmates of that institution. Walters was a desperate man, having been convicted of the crime of willful murder committed for the purposes of robbery. About a year before the riot he attempted to escape from the prison and in his effort was shot down by a guard. From this wound he soon recovered and began to make plans for another attempt to escape. Appellee, Lillian Walters, frequently visited her husband in prison and he laid his plans before her and enlisted her cooperation. They talked it over on several different occasions when she visited him. She finally agreed, with the aid of a discharged prisoner named Sparks, and other prisoners, to smuggle guns, pistols and ammunition into the prison for her husband. This took some time but she and Sparks worked at it diligently until finally they placed the weapons and ammunition in the hands of the prisoner, Monte Walters, who with his confederates inside immediately made an effort to escape, bringing on the riot as above related. Shortly after the killing of Hodge Cunningham and other guards, appellee Walters made a written confession of her part in the awful tragedy. It is dated at Louisville, Kentucky, October 7, 1923, and reads:

"Louisville, Ky., October 7th, 1923.

"I, Lillian Walters, of my own free will and accord, without any promise of immunity from anyone, make this as my free and voluntary statement and confession:

"On the date Jim Sparks was released from the Eddyville prison, I met him at Paducah, Ky., at the train which arrived there at 8:30 a. m., I believe the date was September 14th. I had been told by 'Tex' Walters, my husband, to meet him, and assist him to get a check cashed for four hundred dollars. Previous to this meeting 'Tex' had told me there would

be some firearms purchased to effect 'Tex's' and a man named Harry's escape.

"Sparks and I went to the Citizens Bank and cashed the check for $400.00. We then had lunch, and took a train in the afternoon for Metropolis, Illinois. We remained in Metropolis several days, passing as brother and sister—he, as Cellond Knudson, and I as Lillian Walters, were registered at the Julian Hotel.

"We then went to Cairo, Ill., registered at the Commercial Hotel under the name of Mrs. M. C. Walters. We were there a few days, during which time Sparks purchased two revolvers, one a 38 calibre, and the other, I think, was a 32-20 calibre, from a store either under the hotel, or a few doors from it, and I think it was four boxes, or a hundred rounds for each pistol.

"I wrapped the two pistols and ammunition in separate packages in cloth and green crepe paper.

"On Saturday we left Cairo, Ill., and went to Paducah, leaving Cairo at 5:55 p. m., arriving at Paducah at 8:10 p. m. I left Paducah the following morning at 1:20 a. m., on Sunday, September 23rd, on the train for Eddyville, arrived at 2:01 a. m., was met by the taxicab driven by Thomas Hanberry, went to the Lester Hotel, and registered. I left Sparks at Paducah, and he had the revolvers with him.

"Sunday morning, the 23rd, I visited 'Tex' Walters at the prison. I told him the guns had been purchased, and would be put over the wall that night by Sparks, and 'Tex' told me they had planned to climb a pipe, which runs up along the death house wall, go over the death house roof, and escape over the wall, and that no shooting was to be done. After his escape he was to communicate with me, and after awhile I was to meet him somewhere by arrangements. On the same date at 3:00 p. m., I left Eddyville for Paducah. I met Sparks at the depot, left again on the 1.20 a. m., train with Sparks. I changed at Nortonville for Evansville, Ind. He got off at Kuttawa, a place the first stop the other side of Eddyville. He was to proceed to Eddyville, put the guns over the wall, but instead of that he came on

to Eddyville, and met me at the Acme Hotel. I was under the name of Phyllis Benton. I think he registered under the name of Carl King. He told me he had been trailed from Kuttawa, and that it was impossible to put the pistols over the wall, and he asked me what he should do. I told him I didn't know until I had seen 'Tex.' I went to Eddyville on the following Wednesday, and told 'Tex' we couldn't get them over the wall, and asked him what we should do. He told me to go to Nortonville, call Sparks from Nortonville, to come down on the next train leaving Evansville, and to wrap the guns in oilcloth, and bury them under the bridge. He, Sparks, told me the negro who they called 'Hawk' would get them.

"Sparks met me in Nortonville, and we left Nortonville on the 2:15 a. m. train, got off at Eddyville, walked to this bridge, which is near the depot on the main road to the prison. Sparks buried the pistols and ammunition under the bridge by digging a hole with his hand and covering them with dirt, and put a stick up in the ground so the negro could find them. We couldn't get a train out of Eddyville until 7 a. m., so we walked to Eureka, which is eight miles from Eddyville, and caught the train there for Paducah, arrived there at 8:30 a. m., leaving at 8:40 a. m. for Cairo, Ill., registering at the Rickett Hotel under name of Mrs. M. C. Walters and Carl King, still as brother and sister.

"I left Sunday morning at 7:50 a. m., or thereabouts, on the train for Paducah, leaving Sparks at Cairo. I remained at Paducah until 4:00 p. m., same date, and took the train for Eddyville, arrived at Eddyville at 5:19 p. m., went right to the hotel, and stayed until Monday morning, when I went to the prison, where I stayed two hours talking to 'Tex,' in the presence of two guards. He told me at this time that he had one of the guns, and that he did not know how soon the other one would be in, but he knew it would get in all right.

"I left the prison, returned to the hotel, left on the 12:14 p. m. train for Louisville the same day, arrived at Louisville about 6 p. m., went to my sister's house on Franklin street.

"All expenses, such as railroad fare, hotel bills, and purchase of revolvers and ammunition during this entire time was paid by Jim Sparks, as I had no funds except $19.00, which I received from sale of clothing, etc., as I had been ill since July, having quit my position at the Volunteers of America at Paducah in July.

"Because I am giving this voluntary statement, I do not want anybody to think I am shifting responsibility to anyone else, and am ready and willing to share my part of the burden, and I feel that I have done no more than any wife should and would do towards their husband."

This confession was witnessed by a Louisville detective and the jailer of Jefferson county. On December 4th appellee Walters reaffirmed her confession in the presence of the foreman of the grand jury, saying that it was true in every particular. When she came to testify as a witness for herself in this case she freely admitted her participation in the conspiracy to smuggle guns to her husband in prison, and her efforts to aid him in making his escape. She admitted all that was stated in her written confession and many other facts showing her intimate knowledge of and connection with the conspiracy by which her husband and other prisoners expected to later escape from the penitentiary.

Her defense, if we understand her contention, was that she was assured by her husband when she entered into the arrangement with him to get the pistols and ammunition on the outside and convey the same to him in prison, that the pistols would not be used by him and confederates to shoot anyone in making their escape, and that she believed and relied upon the statements and assurances of her husband that the guns would not be prostituted to so low a cause as the shooting of a guard or other person in order to make way for the escape of himself and his confederates. As unreal, far-fetched and fanciful as this defense appears to be, it was accepted by the jury which heard appellee's case and returned a verdict of not guilty.

The Commonwealth complains (1) that the court allowed appellee Walters to introduce incompetent evidence in her behalf, and (2) that the court gave to the jury erroneous instructions which were prejudicial to

the rights of the Commonwealth and refused to give to the jury instruction "N" offered by the Commonwealth. At common law it was a felony to assist one, lawfully confined in prison on a charge of felony to escape therefrom or to aid, assist or encourage a prisoner in so doing, or in an attempt at escape. By statute, sections 1232, 1239, 1357, 2239 and 3806, it is a public offense to aid, assist or encourage a prisoner to break jail or to escape from prison or lawful custody, the offense being felony where the prisoner is confined upon a felony charge, and a misdemeanor where he is confined merely on a misdemeanor charge.

This prosecution is based upon the well known principle that if two or more persons conspire to commit a felony and in the prosecution of that common design one of them commits murder, it is murder as to all who enter into or take part in the execution of the common object and design for which they combined.

A "conspiracy" is defined to be a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means. (Bouvier.)

It is said that so long as the design to do an unlawful act or to do a lawful act by unlawful means rests in intention only, it is not indictable; but when two or more agree to carry it into execution the very plot is an act in itself and the act of each of the parties, promise against promise, act against act, constituting an indictable public offense.

In the case of People v. Creeks, 170 Calif., 368, it was held that when the accused who was serving a life term and another convict serving a less term, unlawfully conspired to assist one another in escaping from a state prison, each was criminally responsible for the acts of the other committed in furtherance of the common design, and hence the accused was responsible as a principal for the act of his co-conspirator in killing one of the guards. Such killing was a natural and probable consequence of the execution of the design.

Thus, he who conspires with another to do such an unlawful act as will probably result in the taking of human life, is presumed to have understood and anticipated the consequence which might reasonably be expected when carrying it into execution, and to have as-

sented thereto, so held the court of Illinois, in Spies v. People, 122 Ill. 1.

In the case of People v. Lawrence, 143 Cal. 148, Lawrence made a defense much like the one of appellee Walters in this case, insisting that the murder which resulted from the conspiracy was not intended, and the court said:

> "When there was a conspiracy to rob, in which defendant participated, in the perpetration of which a murder was committed by his associate, he is as guilty of murder as if he had actually done the killing himself, and it is no defense that defendant did not intend that life should be taken in the perpetration of the robbery, or forbade his associate to kill."

> "One of the late cases on the subject is Isreal v. State of Texas, 230 S. W., 984; 15 A. L. R. 453, wherein it was held that one assisting in overpowering an attendant to effect a jail delivery is guilty of murder if the attendant is shot by another participant, although there was no express agreement to take the life of the attendant."

The question is, may appellee Walters, after confessing her guilt as a member of the conspiracy to effect the escape of her husband and others from the penitentiary, come into open court with the facts proven and confessed and evade responsibility by pleading that her husband, a member of the conspiracy and a man whom she knew to be desperate and dangerous, had assurred her that if she would bring him the pistols and ammunition that there would be no shooting done in making the escape, and that she believed and relied upon his assurances and so believing, procured the pistols and ammunition for him. This was her only excuse offered in court for her criminal connection with the conspiracy that brought about the death of the guards at the prison.

The trial court gave a number of instructions, among them one presenting her theory of the defense as stated above, in these words:

> "The court further instructs you that although you may believe from the evidence in this case beyond a reasonable doubt that defendant, Lillian Walters, did furnish or smuggle into the penitentiary at Eddyville a revolver or did aid and assist others

in so doing, yet if you shall further believe from the evidence that at or before the time she did so, if she did do so, it was represented to her by 'Tex' Walters, and she was assured by him that said weapons were not to be used, and would not be used by him or others acting with him in the attempted escape from said penitentiary, and shall further believe from the evidence that defendant, in good faith, believed and relied on said statements and representations in the furnishing of said firearms, or in aiding and assisting in furnishing same and that she did not know or have reason to believe that said revolver would be so used, and that same were thereafter used by said 'Tex' Walters and others without any knowledge on her part, and without her consent thereto in any way or manner after same were furnished, the law is for the defendant and you will so find.''

We have examined this instruction with great care and have reached the conclusion that the facts upon which it is hypothecated, if accepted, do not constitute a defense but serve only as mitigating circumstances which the jury might take into consideration in fixing the punishment. She admits that she went about purchasing the pistols and ammunition with great secrecy, and that her husband, Monte Walters, waited in prison until the weapons reached him before attempting to make his escape. She further stated that she knew pistols of that character and ammunition of the kind she purchased and sent to her husband, were deadly in their nature when employed as weapons, and that they might be used for the purpose of killing people. She also stated she had warned her husband against attempting to make his escape from the prison and assured him she would make an effort to get him a pardon if he would not try to escape; that when he asked her to get the pistols she told him she was afraid he would shoot some one or get shot, and that she did not want him or any other person hurt. She confesses without stint that she knew all about the conspiracy of her husband and other prisoners to break out, and that her husband wanted the pistols brought to him before he attempted to make his escape. She says, however, that she thought he wanted them for use after he got out of prison and that she did not expect him to use them in getting out. If it be admitted that she believed he only intended to

use the pistols after he made his escape from the walls
of the prison for the purpose of preventing recapture
or apprehension, she was guilty of a public offense in
providing him with such weapons, for the law forbids
one rendering assistance to a prisoner to make an escape.
The undisputed facts are overwhelmingly against her.
She admits that if he were not going to use the pistols
in making his escape from the prison that he could have
gotten them after he came out where they were hidden at
the bridge on the outside of the prison; but she says he
insisted on having them brought to him in prison, at the
same time assuring her he did not intend to shoot or to
hurt anyone.   These facts admitted, the law steps in and
presumes, and it is not a rebuttable presumption, that
when individuals associate themselves in an unlawful
enterprise, any and all acts done in pursuance and fur-
therance of the common design by one of the conspirators
is the act of all, each being the act of the others, and this
mutual co-equal responsibility of the conspirators for
the acts of their associates, done pursuant to and in fur-
therance of the common design, extends as well to such
results as are the natural or probable consequences of
such acts, as to the ultimate result contemplated, even
though such consequences were not specifically intended
as a part of the original plan, each conspirator being held
for any and all crimes which result from the furtherance
of the conspiracy and which are the natural and neces-
sary consequences of the acts which were contemplated
by the conspirators, and it is no defense that the crime
of murder was not a part of the original conspiracy, if
the conspiracy had for its object the commission of some
other felony in the commission of which murder should
have been reasonably and necessarily anticipated.

The court should not have given instruction "H.-F."
which we have copied above, or its substance.   As said
above the facts presented by appellee Walters as the
basis of that instruction, did not amount to a defense but
are merely mitigating circumstances which should not
have been mentioned in the instructions.

Instruction "N," offered by the Commonwealth
should have been given with the last sentence modified
so as to read "but used for some other felonious pur-
pose," instead of saying "for some other unlawful and
criminal purpose," for it was essential that the criminal
act contemplated should amount to a felony. It will not
then be necessary to give instruction No. 1, given on the

last trial. The court should be careful not to repeat its charge in different instructions. When the instructions are so formulated they will present the law of the case, and the law is so certified.