STATE OF MONTANA, Plaintiff and Appellant, *v.*
GEORGE E. ALTON, Defendant and Respondent.
No. 10191.
Submitted March 9, 1961. Decided September 11, 1961.
Rehearing denied November 2, 1961.
365 P.2d 527.

480

Horace J. Dwyer, Maurice A. Maffei, Anaconda, argued orally, for. appellant.

Malcolm MacCalman, Deer Lodge, M. K. Daniels, Deer Lodge, Forrest H. Anderson, Atty. Gen., Wm. F. Crowley, Asst. Atty. Gen., for respondent, Malcolm MacCalman and Wm. F. Crowley, Asst. Atty. Gen., argued orally.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

Defendant was charged by information with the crime of murder in the first degree, tried before a jury, found guilty of murder in the second degree, and appealed from the judgment of conviction so entered in the district court of Powell County, Montana.

The record discloses the following facts: On the afternoon of April 16, 1959, at approximately 3:30 p.m., August Byers, a guard at the Montana State Prison, relieved another officer in what is known as the new wing of the prison and went out on a catwalk to open a few windows. As he turned to open a window, someone spoke to him and as he turned around some type of solution was thrown in his face, nearly blinding him at the time. Then a torch was lit, and held in such a position that the officer was required to back away to keep from getting on fire. The officer could identify by voice two inmates, Lee Smart and Jerry Myles. There were others but he could not identify them. Request was made for the keys to the gun cage in which a rifle was locked in a cabinet, and they were surrendered.

Marvin M. Wallace, another guard, was also in the new wing at approximately 3:30 p.m. on April 16, in company with

Erwin Sieler, likewise a guard. At approximately 3:35 p.m. while Wallace was sitting in a chair at a desk, an inmate stepped in back of him and laid the blade of a knife on the right side of his neck and said "don't move—don't make a sound." Another inmate had stepped in front of the desk and demanded the keys from Sieler and the blade being pressed deeper into the neck of Wallace, he told Sieler "they mean business, give them the keys." Sieler delivered the keys. Thereafter Wallace and Sieler were marched from the position they had been in towards a stairway door, and upon arrival at the doorway they descended into the detention or isolation room and the door was closed. In a few minutes August Byers was also placed in isolation. As other guards were taken hostage by the inmates, they were likewise placed in isolation.

Wallace testified that at approximately 6:30 p.m. the hostages were removed from isolation and were taken to Gallery two. During the process of this removal he noticed inmates Toms and defendant Alton. At that time Alton was carrying a rifle in what Wallace described as a "ready position." Thereafter Wallace and others were removed from Gallery two to Gallery six, and at that time Alton, armed with a rifle, was one of the inmates who was directing the moving of the hostages and taking an active part.

While Wallace was confined to a cell in Gallery six, Alton stopped in front of the cell on two or three occasions and at one time, speaking directly to Wallace said: "Don't give me an excuse to shoot you, because I don't have any more sense than to do it." At that time he was armed with a .30 caliber lever-action rifle. Wallace also noticed Alton on the catwalk across and in front of the cell in which he was confined and Alton appeared to Wallace to be acting as a look-out.

George Schaffer, a cook employed at the prison, was taken hostage in the kitchen at the prison at approximately 3:35 p.m. on April 16, removed to isolation and later to Gallery two. During his removal to Gallery two he observed defendant

Alton. Later, estimated by Schaffer to be between 12:00 and 2:00 a.m. in the morning, he was moved from Gallery two to Gallery six at which time he again observed defendant Alton who at that time was armed with a rifle and who walked behind the hostages during the removal. On Friday, April 17, he observed the defendant at various times talking to Myles, admittedly one of the prime movers in the proceeding. During the first part of the morning on that day Alton was armed. He also observed defendant taking Jones, an employee of the prison, back and forth from the cell in which he was being held hostage.

Charles Brown, lieutenant at the prison, in company with Captain Everett Felix, was entering the new wing shortly after 3:45 p.m. on April 16. As they walked through the door a voice said "Hold it". Then someone came up from behind and requested their keys and after securing them Brown and Felix were turned around, and then discovered two inmates, defendant Alton and Myles, both armed with knives. Inquiry was made of Brown as to where the shells were located for a gun. The two employees were later placed in isolation. After twenty to twenty-five minutes confinement in isolation Brown was summoned to the head of the stairs where he was met by Myles, who placed a knife in his back and told Brown that he was going to help them get the gun. Alton at this time was present with Myles, and was armed with a knife. Brown, accompanied by Myles and Alton, then started for the old wing. When they got to the old wing they observed Guard Backman coming toward them on the catwalk being followed by another inmate armed with a rifle pointed at Backman's back. When Brown observed this situation he said "What will we do now, go back?" The reply was "Yes." On the way back Brown was accompanied by defendant Alton who walked behind him with his knife. Brown said to Alton, "What's your trouble? What do you want?", and Alton replied "Better conditions". On the return trip they passed the bakery and there were

present there two inmates and Alton spoke to them and said: "I'll send you down a skeleton crew after while". Upon arrival back at the new wing Brown was placed back in isolation, at which time Brown judged there were roughly about sixteen other officers in isolation. Brown remained there until about 7:00 p.m. that evening when he was moved to Gallery two by knife point and by gun. At that time Alton was one of the inmates that moved him, at which time Alton was armed with a rifle. Later, after another move, Brown was placed in Cell 250 and while there he saw defendant Alton at different times during the day, Friday, April 17. During these times Alton was walking back and forth and talking some to Myles. Brown's best recollection was that Lee Smart and George Alton were cellmates at the time of the riot.

Victor R. Baldwin, a prison guard, on April 16, about 3:30 p.m. went to a cell house to relieve officer Lawrence E. Cozzens so he could eat; Cozzens returned at 4:00 o'clock and Baldwin started to return to his station when he noticed some pieces of upholstery lying on some steps and he picked them up and took them back to Cozzens and asked him if he knew what they were. Following a short conversation, Baldwin turned around and started to go through a door when he bumped into George Alton, who placed a knife in his ribs. Alton told him to take it easy and not to try anything. Jerry Myles, armed with a knife, Lee Smart, armed with a rifle, and other convicts were also present. Demand was made of Cozzens for the keys to the cell house which were delivered to Alton and they proceeded to a door that lead to the dining room. Here Alton tried to open the door with the keys but was not successful. The keys were then given to Cozzens who opened the door and handed the keys back to Alton. They then proceeded through the dining room to the new wing and the officers, Baldwin and Cozzens, were placed in isolation. When they were removed from isolation Baldwin saw Alton in the barber shop area armed with a rifle and he directed Cozzens and Baldwin

as to which cells they were supposed to go into. Later when they were moved from Gallery two to Gallery six George Alton told Baldwin to come out of the cell he was in. As they were moved to the new location Alton followed them with a rifle. On this trip Baldwin was "shaken down" which was accomplished by an inmate going through his pockets and clothing and removing everything he carried. While this process was going on Alton was squatted down in front of Baldwin with a rifle directed at Baldwin's chest. Baldwin was placed in Cell 248 on Friday afternoon and saw George Alton on several occasions going by the cell or over on the catwalk.

Lawrence E. Cozzens testified to the same events as officer Baldwin.

Floyd E. Powell, Warden of the Prison, testified that on the afternoon of April 16 he was working in his office when he received a telephone call stating there had been a knifing within the prison itself. This call was received by him a few minutes after 4:00 o'clock. By virtue of this call he was decoyed into the prison, being entirely unaware of what had already gone on inside the walls. When he arrived inside the prison he was confronted by inmates Myles, Smart, Toms, and Randall, all of whom were armed with Smart holding a rifle. He was required to make a phone call to the governor, which he did. This phone call was made from the inner office used by the deputy warden and on entering such office, the warden noticed the body of deputy warden Theodore Rothe lying on the floor on his back, his shirt all bloodstains; froth at his mouth and his eyes open but rolled up into his head. The warden could not detect any evidence of life at that time.

Almost immediately after the conclusion of the telephone conversation to the governor's office, Warden Powell heard a rifle shot from outside the building and at that moment George Alton came into the building through the door and crouched behind the wall. Alton was armed with a 30-30 Winchester rifle. Within a few minutes Alton received some cartridges

from Smart and Alton proceeded to load the rifle. Somewhat later the Warden was removed to the dining room by certain inmates, including defendant Alton who carried a rifle. At some time thereafter Smart and Alton departed and considerable discussion followed between the warden and the inmates then present. As the result thereof, certain inmates were permitted to leave the prison. At some time later Myles also departed from the presence of the warden and further conversations were had between the warden and other inmates and finally the warden, accompanied by two other inmates, left the prison. This departure was accomplished in the absence of Smart, Myles and Alton.

After leaving the prison the warden had occasion to talk with defendant Alton from the turret in the dining room, to which access could be had from the outside of the prison. In these conversations the warden was attempting to prevail upon the inmates to release the hostages and Alton was acting as a spokesman. The warden also talked with Myles from the turret and the conversations continued, four or five being with Alton during Thursday night, all day Friday and into Friday night. The warden also talked with Walter Jones, an employee of the prison, who was brought to the meeting on occasion by Myles or Alton. The warden recalled a conversation he had with Alton about the time he loaded the rifle wherein he asked Alton how he happened to be involved and Alton told him: "I guess it's because I've got a lot of guts, and I have nothing to lose". When George Alton and the warden were talking it appeared to the warden that all requests were framed as having come from someone else but it was never clear from whom the requests came. The warden told Alton that he thought he had enough authority with the group to bring the matter to a close and he felt that Alton did have such authority since they seemed to keep sending him down to do the talking. The terms of the inmates were carried to the warden by Alton and so far as the warden could determine there were no other in-

mates immediately present when the conferences between himself and Alton occurred, though his vision from the turret was rather limited in scope.

This is the record so far as the actions of the defendant Alton are concerned as developed in the State's case, except for the shooting of Theodore Rothe.

William C. Cox was working in the deputy warden's office on April 16 and during the afternoon, Myles, Smart and Toms came in. Myles asked for his medicine and while Cox was trying to find the medicine Myles rushed by him and ran up to the deputy Warden, Theodore Rothe, and told him that he was going to kill him and waved a knife around. Cox picked up a chair to hit Myles and a shot rang out. As Cox described it: "Well, I kinda glanced out of the corner of my eye and I saw Lee Smart lowering the rifle, and the deputy fell." Myles then whirled around and knocked the chair that Cox was holding to the side and stabbed him in the left arm with a butcher knife. Myles then held a knife to Cox's stomach and he was taken into the rest-room. As he came out of the office he saw inmate Toms standing at the rest-room door, armed with a knife. Cox later knocked on the rest-room door and tried to get permission to go to the hospital to have his arm cared for and he was permitted to come out in the lobby and then he saw George Alton with a 30-30 rifle standing by the door to the deputy warden's office. Consent was finally given to Cox to leave the prison.

At the conclusion of the State's case the defendant moved that the information be quashed and dismissed upon the grounds that the facts stated did not constitute a public offense; that the State must prove its case by direct proof and that the proof offered was conjectural and speculative as there was no direct proof that there had been a conspiracy in which the defendant was involved. The motion was denied.

In the defendant's case, Everett Felix, who at the time of the occurrence was captain of the guards at the prison, was

called as a witness. He testified that Alton never molested him but did on one occasion when he was being moved tell him not to try anything because he had nothing to lose; that Alton made an effort to secure Felix's release because of the physical condition of his wife but that Alton told him he was sorry he couldn't let him go, the boss wouldn't go for it. On cross-examination Felix stated he had no way of knowing whether or not Alton ever communicated with anyone else with regard to securing his release; that at the time of the conversation before related Alton was armed with a 30-30 carbine.

Walter Jones, Jr., employed as a sociologist at the prison on April 16, 1959, at about 4:00 p.m. on that day was interviewing prisoners in the athletic office and at some time between 4:00 and 4:30 p.m. the door was thrown open and George Alton stood in the doorway with a rifle pointed at him and held at his hip and stated something to the effect: "Don't do anything foolish, and you won't get hurt". Alton ordered him outside in the office area and other inmates closed in on him, one going through his pockets. He was then escorted to isolation by Alton and the other inmates. He was later removed from isolation and placed in a cell. Later Myles contacted him and indicated he was going to kill him and thereafter Jones sent for Alton. However Myles returned and Jones proposed that he act as go-between, Myles stating that he would think about it and left. Later on Friday morning Myles returned and said he had decided to accept the idea. About 10:00 o'clock on Friday morning he was escorted to the dining room to meet the warden. On this trip he was escorted by Myles, on subsequent occasions he was escorted by Alton, who was armed with a stub of a knife, Jones being handcuffed. During the first conversation while Alton was present he held onto the chain between the handcuffs, Jones being handcuffed behind his back. Jones testified that Alton was solicitous of his welfare on these trips. Later certain persons were permitted to enter the dining room to converse with the inmates; Jones had

been released outside the walls for this purpose and then returned inside as a hostage. At this meeting Alton was present. After the meeting Alton returned Jones to his cell and locked it. Alton then stationed a prisoner outside the cell with a pipe and instructed him to hit anybody that tried to get at Jones. There were three or four trips to meet the warden and Alton escorted Jones each time except the first. Alton in these conversations was representing certain demands to the warden, apparently such demands originating with Myles. Jones heard Alton explaining to Myles what occurred in the conferences with the warden and trying to sell Myles on the plan that Alton and the warden had agreed to but in the words of Jones, Myles kept "jacking up" his price, in other words making additional demands each time a tentative agreement had been reached. Lee Smart also threatened to kill Jones when Alton was present and Alton told Smart not to do it as they still needed him. Finally Jones went out of the prison to carry some increased demands from Myles to the warden and while he was supposed to return as a hostage the warden refused to permit him to return.

Jones testified that from his observations Alton played the role of that of a "buffer zone" in the riot, that he was caught in the middle. Upon cross-examination Jones said that he would consider Myles, Smart and Alton as the three main ones in leadership positions.

Earl H. Jackson, an inmate, testified that at a time when a certain inmate threatened to kill the warden that George Alton took a stand that such should not be done. From his observations Smart and Myles were definitely the bosses. On cross-examination he testified as to a conversation going on between two inmates who only had a butcher knife as to whether or not they could go and take Walter Jones and then Alton showed up armed with a rifle and said "We don't want nobody hurt, so I will take him myself". Alton then opened the door and told Jones to come out.

Gerald Lynam, Catholic Chaplain at the prison, who was present at a conversation between the warden in the tunnel and Walter Jones and George Alton in the dining room wherein the warden was trying to convince Alton to try and close the riot out, testified Alton had replied "Well, I don't know if I will be able to do it, but I will try."

George E. Alton, the defendant, testifying on his own behalf, stated that he had been in isolation for thirty days for possession of a scissors sometime in 1958; that he attempted to and did escape from confinement while a trusty and was again put in isolation for thirty days, followed by thirty days in segregation. Alton was a cell mate of Lee Smart but said that he had never had any conversation with Smart about any riot until about 3:30 p.m. on the afternoon of April 16, when Smart and Myles came to his cell. At that time Smart had a tin container. Myles then advised Alton they were going to take the joint over for better conditions and that he replied that he didn't want to get mixed up in it, that he stood a possible chance of getting out during this year. Myles then pulled a knife out and poked him in the ribs and said "Get out in that Gallery" and Alton got out on the Gallery, further stating that he knew Myles would cut him. The three then went out on the Gallery catwalk and Smart laid the torch in front of Byers, Myles demanded the keys and secured them from Byers. The keys were then delivered to Alton by Myles who told him to get on down and get the door open and get the gun. The party accompanied by other inmates, then went to the lobby of the new wing and Myles gave Alton the knife. Thereafter Alton and Myles went to the old wing and Alton stated that he was told to go in and get Cozzens; that he refused because he didn't want to get involved but Myles poked him again in the ribs with the knife. Myles started in, Alton asserted he looked around and observed Smart with a rifle, so he followed Myles and they took as hostages officers Baldwin and Cozzens. Myles then ordered Cozzens to give Alton the keys and Coz-

zens complied but Alton stated he was so nervous he couldn't get the door open with the keys so Cozzens opened the door. After these two hostages were placed in isolation, officer Charles Brown was removed from isolation to assist in getting a gun from the old wing. Alton and Myles took Brown to the old wing but on the way they met an inmate, with a rifle, walking behind officer Backman. The rifle having already been secured, they returned Brown to isolation. Myles and Alton then returned to the old wing and met Smart who then had two rifles and Smart gave one to Alton. There followed some discussion with regard to taking Walter Jones and Alton stated that he finally said: "Well, I will take Mr. Jones, because I don't want anybody to get hurt". Alton then took Jones into custody, delivered him to the new wing where he was put in isolation. He related about the movement of the hostages; asked other inmates to make sandwiches and coffee, went down to see they were doing it. While in the kitchen word came to him to bring the rifle to the office, on the way over a shot was fired and he ducked around the inside corner of the office. When he arrived in the office Myles told him the deputy warden had been shot; that there were many people milling around and later he went into the deputy warden's office and found there the warden, Myles and Smart. In that office Smart handed him some shells and he loaded the gun. On Friday evening Alton returned to his cell, found it ransacked, and then he went over to the new wing, took a cell there and stayed there until the National Guard came in.

Upon cross-examination Alton admitted that when he was in segregation in isolation for sixty days because of his escape that Myles was also there, Alton being on the bottom floor and Myles on the top floor and they could communicate with each other there. Alton was asked this question:

"Q. On the 18th day of April, 1959, in the Mail Room of the Administration Building or Office, inside the Montana State Prison, did you not state in the presence of Mr. William

Crowley and myself, as follows: 'Q. How long have you guys been planning this now? A. I don't know. It ain't been very long, I know—I know that. I ain't been out of the hole for the last two months, or three months, something like that. It wasn't that long though—I wouldn't have any idea of how long I was down in the hole. Q. A month, do you think or two months? A. No, I wouldn't set a definite date, but it is around—I would say around two weeks, without a definite date for sure—I don't remember.' Now George, do you remember saying that?"

He answered that he did not recall making the statement, saying on the day the riot ended he was pretty well shook up and pretty scared and tired. He further stated he didn't remember making the statement but he could have made it. He admitted he may have stated to the warden that he got into this because he had lots of guts and had nothing to lose. On re-direct examination Alton stated he did not start any riot in the prison, or conspire or plan to start one.

At the conclusion of the taking of testimony defendant moved the court for a directed verdict which was denied.

Defendant upon this appeal makes nine contentions for reversal of the judgment which cover fifty-eight specifications of error. In arguing these contentions and specifications of error, defendant has divided them into nine groups, each of which he labels as a question involved. We shall follow the same procedure in our consideration of the various issues upon this appeal.

The first question posed by defendant is that one cannot be convicted of a homicide alleged to have been committed by a co-conspirator before the actual slayer has been proven guilty. In support of this proposition defendant argues that it was necessary that Lee Smart be alive so that he could be charged and tried so that evidence of his capacity to commit the crime charged could be available to defendant in his defense, and that while defendant concedes he could be tried for a crime actually committed by a co-conspirator before such co-conspir-

492

ator is charged and tried, that such principle of law presupposes that the co-conspirator is alive. Defendant further asserts that if Smart had been tried and convicted and appealed his conviction and died pending such appeal that the prosecution would have abated, not only as to Smart but as to all co-conspirators.

These propositions advanced by the defendant appear quite novel in this jurisdiction. The general rule is that a co-conspirator may be convicted of any crime committed by any member of a conspiracy to do an illegal act if the act is done in furtherance of the purpose of the conspiracy. See 15 C.J.S. Conspiracy § 75, p. 1107; 11 Am. Jur., Conspiracy § 40, p. 571; 5 Cal.Jur. 500; 11 Cal.Jur.2d 227.

Section 94-204, R.C.M.1947, reads:

"All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics, or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed."

In Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, 715, three defendants, Shockley, Thompson, and Carnes, were convicted by a jury of first degree murder because of a killing during an escape attempt at Alcatraz in 1946. The evidence showed that the murdered man, a guard named Miller, was shot and killed by a convict named Cretzer, who was himself subsequently killed by other prison guards. The conviction of Shockley and Thompson was upheld by the Ninth Circuit Court of Appeals. In discussing the conspiracy the court said:

"The act of Cretzer in shooting Miller was part of a plot

and plan to seize the guns and ammunition of a guard or guards as a first step, then overpower the guards in the cell building and secure their keys which might provide access to an open prison courtyard and to the cells in the cell building, and then to use such force as was necessary to insure the escape of the conspirators from the penitentiary. The fact that the conspirators first armed themselves with a rifle and pistol, and with other weapons including clubs and wrenches, undoubtedly persuaded the jury that they fully intended to use these lethal weapons to effect their escape.

"In the law of conspiracy the overt act of Cretzer in shooting Miller while the escape effort was under way, is attributable to appellants. See Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180 [90 L.Ed. 1489]."

In Jones v. State, 31 Ala.App. 504, 506, 19 So.2d 81, 83, the question was raised whether a co-conspirator could be exonerated from blame because of the insanity of the principal actor in the crime. The court said:

"While evidence of Jaffie's insanity was probably admissible as of the res gestae, it is timely to observe that the insanity, if so, of the gun wielder, Jaffie, would not exculpate the appellant if he conspired with the principal or aided or abetted him in the killing of deceased (and this was the only theory upon which appellant's conviction could rest). If appellant so conspired or aided or abetted in the homicide, the mental irresponsibility of Jaffie Jones could not be invoked to exonerate said appellant. One may or could use an insane person as the agent of destruction—or conspire with such person to accomplish the homicide—just as guiltily as with a person of sound mind. The fact, if true, that the co-conspirator or principal in the crime is not amenable to justice because of mental irresponsibility does not exempt the other from prosecution. Pruitt v. State, 91 Tex.Cr.R. 189, 237 S.W. 572; People v. Armstrong, 299 Ill. 349, 132 N.E. 547; Conley v. People, 170 Ill. 587, 48 N.E. 911; 22 C.J.S. Criminal Law §§ 85, 101."

494

· In Feder v. United States, 2 Cir., 1919, 257 F. 694, 696, 5 A.L.R. 370, the court said:

"The rule as to convictions in conspiracy may be summed up by saying that, provided the acquittal or death of co-conspirators does not remove the basis of the charge, one defendant may be convicted of the offense. Cf. People v. Mather, 4 Wend. (N.Y.) 229, 21 Am.Dec. 122; People v. Richards, 67 Cal. 412, 7 Pac. 828, 56 Am. Rep. 716, and cases supra." See also Annotations appearing 5 A.L.R. 373, and 72 A.L.R. 1185.

It would appear to us that a co-conspirator may be found guilty of a crime committed by his fellow conspirator whether the fellow conspirator is alive or dead, competent or incompetent, at the time of his trial.

We do not believe that the assertion that the charge of murder abated on the death of Smart is well-taken as will appear from the foregoing authority and those hereafter discussed. It must be remembered we are here dealing with a charge involving a conspiracy.

: There is no merit to defendant's contentions as to the first question raised.

·· The second question raised is that defendant could not be convicted of any crime on mere conjecture, speculation, suspicion or probability. With this statement we agree.

In support of this contention, however, defendant argues that there is no proof that Lee Smart fired the shot that killed the deputy warden. We have previously discussed the evidence as given upon the trial, and it appears clear that there were only two rifles in the possession of the inmates at the time of the killing of the deputy warden. One of these rifles was in the hands of Lee Smart in the deputy warden's office, the other in the possession of the defendant. Warden Powell stated that Smart was holding a rifle when he made the telephone call from the deputy's office and at that time the deputy warden lay on the floor in the condition heretofore described; that thereafter he heard · a shot and then defendant ducked into

the building with the other rifle. William C. Cox, present at the time of the shooting, described the scene,.heard the shot, saw the deputy warden fall, saw Lee Smart lower the rifle. Defendant, when a witness on his own behalf testified that word came to him in the kitchen to bring the rifle to the office; that on the way over a shot was fired and he ducked around a corner and that when he arrived in the office Myles told him the deputy warden had been shot. From the record it is uncontradicted that Smart was the only person present in the deputy warden's office with a rifle at the time the shot was fired and he was observed lowering the rifle immediately after the shot. While defendant urges that the second shot fired when he arrived at the building might have been the shot that killed Rothe, there is no foundation for any such assumption since the undisputed evidence shows that Rothe had already been shot prior to the time the second shot was fired. There is no merit in this contention.

The third contention of the defendant is that the evidence failed to prove him guilty of murder as charged; he asserting that conspiracy is out of the case by reason of the jury verdict of guilty of second degree murder, and that there was not sufficient evidence that he extended any aid or encouragement to the slayer; that he was not present when the deputy warden was killed, and that he should be chargeable only with his own acts or those he purposely incited or encouraged, and that there was no proof that he ever incited or encouraged the slayer.

In support of this contention defendant relies upon State v. Ochoa, 41 N.Mex. 589, 72 P.2d 609, 616. In New Mexico the distinction between an accessory before the fact and a principal and between principals in the first and second degree in felony cases has been abolished.

The New Mexico court holds in the Ochoa case, supra, that before an accused may become liable as an aider and abettor he must share the criminal intent of the principal; there must

be a community of purpose, participation in the unlawful undertaking; and there must be a common purpose which means a like criminal intent in the minds of the defendant and the slayer to render the defendant guilty. They further held that an accused may not be held for the independent act of another even though the same person be the victim of an assault by both because of the want of a sharing of the criminal intent essential to proof of aiding and abetting. That court, however, does state: "Of course, where conspiracy is established, all are equally guilty whether present or not and irrespective of physical participation, aid or encouragement extended at the time of the offense." The New Mexico court also cited the case of Woolweaver v. State, 50 Ohio St. 277, 34 N.E. 352, which held that if there was no conspiracy then upon the springing up of a sudden fight each should be chargeable only with his own acts, and such acts of the others as he may purposely incite or encourage.

It will thus be seen that the New Mexico authority asserted by defendant clearly distinguishes between cases where a conspiracy is established and where such proof is lacking.

Before we discuss this point further, let us digress to consider the evidence in this cause of the existence of a conspiracy.

The events started at about 3:30 p.m. on the afternoon of April 16, 1959. About 3:45 p.m. Alton and Myles take Lieutenant Brown and Captain Felix as hostages, both convicts being armed with knives. After placing Brown in isolation he was summoned to help them get a gun, again Alton and Myles armed with knives. Passing the bakery area on that trip Alton remarked to other inmates: "I'll send you down a skeleton crew after while." About 4:00 p.m. Alton placed a knife in the ribs of guard Baldwin and Baldwin and Cozzens were taken hostage. Present also was Myles, armed with a knife, and Smart, armed with a rifle, and other inmates. Upon the removal of hostages from isolation to Gallery six, Alton was there, directed the moving, taking an active part, armed with

a rifle. He talked later to a hostage in Gallery six, stating: "Don't give me any excuse to shoot you because I don't have any more sense than to do it." While a guard was "shaken down" during this removal Alton held a rifle directed at the guard's chest. He was at times stationed on the catwalk across from the cells holding the hostages.

Alton came to the deputy warden's office armed with a rifle and there in the presence of Warden Powell loaded it with shells. When the warden was removed from the office area to the dining room Alton was present, armed with a rifle. On the following day, Friday, he was seen in discussion with Myles, armed during part of that day. Alton talked with the warden in the dining room and on one occasion in reply to the inquiry as to how he happened to get involved, Alton stated: "I guess it's because I've got a lot of guts, and I have nothing to lose." The terms of the inmates were carried to the warden by Alton. He also brought Walter Jones, Jr., back and forth to meet with the warden. Smart and Alton at the time of all these occurrences were cell mates.

In the defendant's case from his own testimony it appears that while he testified he was coerced into participation by threats, he was present with Myles and Smart in the very first instance when Byers was taken hostage by use of a blazing torch and the first rifle secured. That about 4:00 p.m. on April 16th Alton, armed with a rifle, took Walter Jones, Jr., the prison sociologist, a hostage and escorted him to isolation.

There are other acts of participation in the record but these will suffice for our purpose here. It was a question of fact for the jury's determination as to whether or not a conspiracy existed, but it becomes apparent from the foregoing recitation of events that Alton was present on many occasions during the taking of hostages, on practically every occasion armed. That in the early stages he was armed with a knife, that when the two rifles had been secured thereafter he was armed with one of them, Lee Smart with the other. By his testimony he was

in fear of Myles, admittedly with Smart a ringleader in the whole affair, but most significantly with only two rifles in the possession of the inmates during the proceedings, one was generally in the possession of Alton, the other of Smart.

The Montana State Prison is not a small area, it consists of many buildings and areas within buildings, and was staffed with many guards. To take over such an institution within a matter of minutes by taking hostage all the custodial forces within the confines would require some preconceived mode of action. The record demonstrates an efficient coordination of movement, even to the point of being able to decoy the warden into the confines of the prison without knowledge that his custodial staff were already hostages and his deputy warden shot.

It is our opinion that the evidence was sufficient to permit the jury to find that a conspiracy was proven.

By reason of what the New Mexico court stated in the Ochoa case, supra, and its supporting authority, a conspiracy having been established, the holding in that case would not be authority in the instant matter.

Montana follows the general rule of law on conspiracy which obtains almost without exception throughout the United States and particularly in California, from which state our statutes are derived. (Section 94-1101, R.C.M.1947, defining unlawful conspiracies is identical with section 182, Cal.Pen.Code; sections 94-2501 through 94-2503 are substantially identical with sections 187 through 189, Cal.Pen.Code).

The general rule is stated in 5 Cal.Jur. at page 500:

''Where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine, and irrespective of whether such unlawful act as the objective of the conspiracy was a felony or a misdemeanor. The rule applies although the part a conspirator was to take in

the conspiracy was a subordinate one, or was to be executed at a remote distance from the remaining conspirator or conspirators. And the rule extends to the consequences which might reasonably be expected to flow from carrying into effect the unlawful combination, even though they were not intended as a part of the original design or common plan." See also 11 Am.Jur. 548; 15 C.J.S. Conspiracy § 75, p. 1107; 11 Cal.Jur.2d 227; Wharton's Criminal Law, 12th Ed. Vol. 1, p. 343. This is also the rule in this jurisdiction.

In State v. Dennison, 94 Mont. 159, 21 P.2d 63, 64, this court said: "* * * the salutary rule is, that where several persons conspire or combine together to commit an unlawful act, each is criminally responsible for the acts of his associates or confederates, committed in furtherance of any prosecution of the common design, although such acts were not intended as a part of the original plan."

That this rule extends to any crime committed during the progress of the conspiracy was considered in State v. Hayes, 38 Mont. 219, 221, 99 P. 434, 435, where this court stated:

"It is contended that the evidence does not disclose a conspiracy to kill Robinson, but only to effect an escape, and that, as it fails to show that appellant killed Robinson, he could not be legally convicted of murder because the killing was not included in the conspiracy. The evidence shows that Robinson was actually killed by Rock, or Rock and Stevens. It is conceded that there was a conspiracy on the part of 'some of appellant's codefendants' to effect an escape from prison; but, say counsel, 'this falls far short of establishing the conspiracy contended for, to-wit, a conspiracy on the part of the appellant and his co-defendants to kill Robinson.' We have carefully examined the record. No specific testimony was given fixing the scope or range of the conspiracy, but to our minds it clearly appears from the evidence that the object of the conspiracy was to effect an escape from the penitentiary by force, that the disabling or killing of all officers of that institution whose

500

presence tended to interfere with the design or prevent its success was a part of the conspiracy, and that Hayes was a party to the entire plan of procedure. He assaulted the warden at about the time Rock and Stevens were assaulting Robinson. In this view, the killing of Robinson, to use the language of this court in State v. Howard, 30 Mont. 518, 77 Pac. 50, was 'a part of the main transaction.' "

There are a number of cases like the Hayes case which hold that a conspiracy to escape from jail or to rescue prisoners from jail, in which it is agreed to overcome any resistance by force, including deadly force, can result in a conviction for first degree murder if any person is killed during the progress of the conspiracy. See People v. Creeks, 170 Cal. 368, 149 P. 821; People v. Wood, 145 Cal. 659, 79 P. 367; State v. Brooks, 228 N.C. 68, 44 S.E.2d 482; Shockley v. United States, supra; Comonwealth v. Walters, 206 Ky. 162, 266 S.W. 1066; State v. Stidham, Mo.1957, 305 S.W.2d 7; State v. Holloway, 355 Mo. 217, 195 S.W.2d 662.

In most of such cases the participants have been found guilty of the same degree of murder, but this is not required by law. All participants may be found guilty of any of the degrees of murder, or one or more may be found guilty of each degree. Such was the situation in the case of People v. Kauffman, 152 Cal. 331, 334, 336, 92 P. 861, 862. In this case, the defendant, Kauffman, and five other men set out to commit a burglary. All but Kauffman were armed with revolvers. They decided against the burglary when they found a nightwatchman at the premises, and, after some discussion of another possible burglary, began walking home. On the way they were accosted by a policeman who was shot and killed by one of the party, Frank Woods. Woods was found guilty of first degree murder, and Kauffman of second degree murder. Kauffman appealed claiming that he had been convicted on the conspiracy theory and that the killing was not part of the conspiracy. The court said:

"* * * As has been said, the appellant was not armed, and during the shooting was standing still, his own testimony being to the effect that he held his hands up in the air.

"The theory of the people was that the killing of Robinson was an act committed in furtherance of a common design or conspiracy by the six defendants to commit an unlawful act, and that, therefore, Kauffman, as one of said conspirators, was criminally responsible for such killing, although he took no active part in the attack upon Robinson.

"* * * If such conspiracy was still existent at the time of the shooting, the result that Kauffman was responsible for acts done by any of the conspirators follows as truly as did the conclusion that evidence of the acts of co-conspirators was admissible against Woods."

In affirming the conviction, the court held that the conspiracy extended to all of the acts of all the conspirators, and that the conspiracy extended to the return journey as well as the abortive burglary attempt.

In a later case, People v. King, 30 Cal.App.2d 185, 85 P.2d 928, the California Court of Appeals upheld the conviction of second degree murder of several conspirators who had planned an assault but had, in their excitement, killed the victim. The appellant King helped plan the assault, but was not present and did not know of the killing until some time later. The court held that all the conspirators were guilty since the killing was a natural consequence of the original criminal design.

All parties to a conspiracy are guilty whether their part in the conspiracy is large or small, and whether or not that part is to be carried out at a distance from the other conspirators. In People v. King, supra, the defendant King, was miles away from the scene of the killing but was found guilty of second degree murder for his part in the conspiracy to assault the victim.

This doctrine has been invoked many times by the courts in connection with prison riots, disturbances and escape at-

tempts, particularly in those cases where the absent member was active in securing the weapons with which the killing was done.

In Commonwealth v. Walters, 206 Ky. 162, 266 S.W. 1066, 1069, the wife of a convict conspired with her husband and an ex-convict to deliver guns and ammunition to her husband in the prison to use in a prison break. Her husband attempted escape and killed several guards. Her defense was that she did not believe the guns were to be used in the escape, but afterward. The Kentucky Supreme Court in discussing this said:

"* * * The undisputed facts are overwhelmingly against her. She admits that if he were not going to use the pistols in making his escape from the prison that he could have gotten them after he came out where they were hidden at the bridge on the outside of the prison; but she says he insisted on having them brought to him in prison, at the same time assuring her he did not intend to shoot or to hurt anyone. These facts admitted, the law steps in and presumes, and it is not a rebuttable presumption, that when individuals associate themselves in an unlawful enterprise, any and all acts done in pursuance and furtherance of the common design by one of the conspirators is the act of all, each being the act of the others, and this mutual co-equal responsibility of the conspirators for the acts of their associates, done pursuant to and in furtherance of the common design, extends as well to such results as are the natural or probable consequences of such acts, as to the ultimate result contemplated, even though such consequences were not specifically intended as a part of the original plan, each conspirator being held for any and all crimes which result from the furtherance of the conspiracy and which are the natural and necessary consequences of the acts which were contemplated by the conspirators, and it is no defense that the crime of murder was not a part of the original conspiracy, if the conspiracy had for its object the commission of some other

felony in the commission of which murder should have been reasonably and necessarily anticipated.''

In Kirby v. State, 23 Tex. Cr. 13, 5 S.W. 165, defendant Kirby and another were convicted of second degree murder for the killing of a jail guard in an escape attempt. Kirby had been locked in his cell throughout the attempted escape and killing. His participation had been limited to helping plan the escape and supplying the weapon used, a heavy bar of iron with which his co-conspirator, Cannon, bludgeoned the keeper to death. The court held this sufficient to uphold the conviction of second degree murder.

The facts of the Kirby case have a marked similarity to those at hand, in each case the defendant was not present at the murder, but had supplied weapons to the actual murderer. Each was found guilty as a conspirator of second degree murder.

In State v. Holloway, 355 Mo. 217, 195 S.W.2d 662, the appellant had not even secured the weapon, but had been the moving spirit in a plan to effect his own escape. He enlisted the aid of two trusties, delegated one of them to seize a machine gun from the sheriff, and, by threats, make the sheriff release Holloway. The gun was secured, but the sheriff ran away and the co-conspirator shot him. Holloway remained in the cell and was never released. He was, however, found guilty of first degree murder.

In the present case, Alton admits that he was one of a party of inmates who got up on the catwalk and took the guard's keys while Lee Smart menaced the guard with a torch. Alton opened the locked guard's cage, and, with some other inmates entered the cage and tried to unlock the gun cabinet. He could not get it unlocked so the inmates broke the cabinet open, took the rifle, and Alton delivered it to Lee Smart.

There is some contention by defendant that the intent of these parties has not been shown and cannot be shown by circumstantial evidence. This is contrary to the general rule

504

and the rule of this court enumerated in State v. Hayes, supra. A good statement of this rule was given in People v. Udwin, 254 N.Y. 255, 262, 172 N.E. 489, 492, where the conviction of several conspirators for a murder during their attempt to escape from Auburn prison was sustained:

"In Ruloff v. People, 45 N.Y. 213, 217, it was said: 'All present at the time of committing an offense are principals, although only one acts, if they are confederates, and engaged in a common design, of which the offence is a part. \* \* \* *'This general resolution of the confederates need not be proved by direct evidence. It may be inferred from circumstances; by the number, aims and behavior of the parties at or before the scene of action.'* In People v. Friedman, 205 N.Y. 161, 165, 98 N.E. 471, 473, 45 L.R.A. (N.S.) 55, it was said of a request to charge: 'The request assumes that if the appellant did not fire the fatal shot he could escape liability unless the conspiracy expressly contemplated the use of such force or violence as might cause death. This is an erroneous view of the law.' " Emphasis supplied.

In our opinion this record is replete with evidence that Alton aided, abetted and encouraged the events which transpired and under the foregoing authorities he is equally guilty with the actual slayer. It is beyond our comprehension how any person could participate in the activity which defendant did without knowing full well that injury and death couuld result from such actions.

█ In our opinion the contention of defendant that the failure of the jury to find him guilty of first degree murder necessarily means that there could have been no conspiracy is without merit.

Defendant's fourth contention is that he was denied a fair and impartial trial by reason of alleged errors by the court during the trial. The argument here covers many of the specifications of error directed to motions to strike answers given on cross-examination on the ground that the answers were con-

clusions or hearsay; objections that questions were improper redirect examination; the refusal of the court to permit certain alleged expert testimony to be given; and to admit certain records in evidence, or to permit the defendant to testify to certain matters.

We have carefully examined each of the specifications and we deem it unnecessary to belabor this opinion with a recitation as to the situation appearing in each one since we find no reversible error committed by the court in its rulings thereon.

Defendant's fifth contention is that the court misdirected the jury on matters of law, and his sixth contention is that the court erred in refusing to give certain instructions requested by him.

We have carefully reviewed the instructions given by the court, and it appears that they are correct statements of the law and justified by the evidence presented in this cause and it would appear unnecessary to separately discuss each of the challenged instructions. We find no reversible error.

As to the refused instructions proposed by defendant, they dealt for the most part with the conspiracy aspect of the case and were offered in support of defendant's contention that conspiracy was not an element in this cause, and from what we have already stated in this opinion were correctly refused by the court. Other refused instructions were fully covered by instructions given by the court or were not justified by the evidence in the case. We find no reversible error.

Defendant's seventh contention deals with the fact that defendant appeared in convict garb throughout the trial and that the denial of his request that he be permitted to appear in civilian clothes denied him a fair and impartial trial.

Defendant cites as authority for his position certain cases which declared it reversible error to require a defendant to appear in irons or to be fettered or kept manacled during his trial. Such was not the case here. It is true defendant's coun-

sel made a request that the defendant be permitted to appear in civilian clothes and the court observed it believed that was a matter within the discretion of the warden of the Montana State Prison, and the court was not about to make a rule as to how witnesses should be attired, so long as they were properly attired. It is difficult to see how any prejudice could result since admittedly defendant was an inmate of the prison; the locale of the testimony during the entire trial was within the confines of the prison, and defendant freely testified about a number of matters relating to his convict status. We see nothing prejudicial in this respect.

Defendant's eighth contention again raises the question that the court denied him a fair and impartial trial and we shall recite certain particulars wherein such denial is specified.

The first is that counsel for the State was guilty of misconduct in remarks made in the opening statement. Objection was made to the remarks, the court sustained the objection and directed counsel to confine his remarks to a statement as to what the State intended to prove. The remarks of counsel do not appear to us to have been prejudicial but the objection of defendant's counsel was sustained and no further request was made of the court. While counsel now contend that the court failed to admonish the jury, he made no such request of the court and the court cannot be placed in error for not doing something it was never requested to do.

The second is that defendant made certain other objections to remarks in the opening statement which were overruled by the court. We fail to see any error here since the State's counsel was merely outlining what the State intended to prove and there appears nothing improper or prejudicial in the statements made.

The third is that defendant's counsel objected to certain language in a question and the objection was sustained. Nothing further was requested and the court cannot be charged with

error here in failing to admonish the jury when no such request was ever made of it.

The other contentions of defendant under this subdivision need no discussion since we deem them to be without merit.

The ninth contention of defendant is that his constitutional right to a fair and impartial trial was violated by gross misconduct of counsel for the State. Many of the statements of the State's counsel about which defendant complains now were not objected to in the district court nor was the court requested to admonish the jury to disregard them. The matters objected to in the closing arguments appear to us to be but fair comment on what the evidence in this cause showed, and while it is perhaps true that such remarks were distasteful to the defendant and his counsel, they were justified by the record.

One instance about which defendant complains is that the state's counsel in summation referred to defendant as a "thrice convicted felon". Defendant states the record does not support such improper remark. Upon this trial the defendant was charged with the crime of murder and a previous conviction of the crime of burglary in the first degree with a prior conviction of felony. By stipulation of counsel, State's Exhibit 15 was received in evidence and read to the jury. This exhibit was a certified copy of a commitment to the state prison dated October 25, 1956, following the conviction of the defendant for the crime of burglary in the first degree, together with a prior conviction of a felony. This exhibit established in the evidence that the defendant had been twice convicted of a felony. Defendant testified that he escaped from the Montana State Prison, was charged with such escape, a felony, and received a one-year sentence for it. It appears quite clear that defendant was a "thrice convicted felon" as the State's counsel called him.

We have carefully examined the various other matters raised by the defendant and we find no prejudicial error.

Having reviewed the entire record, and examined all the specifications of error, we fail to find any prejudicial error. Therefore the judgment of the district court is affirmed.

MR. JUSTICES ADAIR, CASTLES and JOHN C. HARRISON concur.

## ON PETITION FOR REHEARING

### MR. CHIEF JUSTICE HARRISON:

Appellant has filed a petition for rehearing and contends that this court overlooked material facts. Among the various assertions set forth is that we overlooked the fact that it is practically humanly impossible for a man to be shot and killed by a bullet fired from a .30-.30 rifle at a distance of approximately twenty feet and not have the slug go completely through him or tear his internal organs asunder. He also asserts the slug struck no bones.

There is not a scintilla of evidence in the record here upon which to base any such contentions. The doctor who examined the deceased deputy warden upon his removal from the prison and later performed an autopsy, testified that the bullet entered the right chest, that it went through the right lung, the right auricle, the aorta, the left lung, and lodged in the left chest. He was asked no questions upon either direct or cross examination as to any bone structure damage. There is likewise no evidence in this record as to the effect or result of the striking power of a .30-.30 rifle bullet at any range, nor any proof that the internal organs were not torn asunder.

It is also asserted that we have overlooked the physical fact of the minimum amount of damage caused to the internal organs of the deceased's thoracic area by the slug. The undisputed opinion of the doctor, based upon his examination and autopsy findings, was that deceased's death was instantaneous

upon the infliction of his wound. How one can describe a bullet which upon impact instantly took the life of a human being as causing a minimum amount of damage is beyond the perception of this court.

Complaint is made that we have assumed only one shot was fired by the tower guard. That is the evidence in the record before us. While appellant asks why the tower guard was not called as a witness by the State, we do not find in the record that the defense ever requested that the tower guard be called as a witness, nor that he was ever subpoenaed by appellant as a witness. We shall allude to this matter later.

The most serious charge leveled at this court's opinion is the contention that the record shows that the rifle in the hands of Lee Smart at the time the deputy warden was shot and killed was an empty unloaded rifle and therefore the bullet which killed him could not have been fired by Smart.

To sustain this position appellant quotes the testimony of Officer Brown wherein he testified that he saw Lee Smart holding the rifle obtained from the gun cage in cell block one. The officer knew it was this particular rifle because when he was taken by the inmates to secure the rifle from cell block two they met Officer Backman who was followed by an inmate who had the rifle from that cell block. Brown further testified that there was no ammunition for the rifle in cell block one, but there was ammunition for the rifle in cell block two. The record discloses both rifles were of the same caliber. It must also be remembered that appellant was one of the inmates accompanying Brown on this trip to secure the rifle from cell block two.

To entirely dispel appellant's charges we need only turn to his own testimony. He was asked by his counsel:

"Q. What happened when you got back to the old wing, George? A. *Smart was there, and he had both rifles.* Emphasis supplied.

"Q. Smart had both rifles? A. Yes.

"Q. And what happened there then? A. Well, we went in, and there was some discussion between Smart and Myles, and Smart walked over and he handed me this rifle.

"Q. Smart handed you the rifle? A. That's right."

This testimony relates to the return of Alton from the trip with Officer Brown to obtain the rifle from cell block two, which rifle had ammunition for it. Appellant further testified that the rifle Smart gave him was empty. Thus, if we have two rifles, one with ammunition and one without, both in the possession of Smart, and he gave one rifle to appellant and it was empty, the only deduction which can be made is that the rifle retained by Smart was the one with the ammunition.

Further, appellant related his movements thereafter up to the time that word came to him to bring the rifle to the office. On the trip over to the office the shot from the tower was fired and in regard to that appellant stated:

"Well, I don't know why I looked up, but I looked up, *and this officer was starting to level his rifle down at me,* so I started to run up the office stairs, and then * * * there was a shot fired, and I just ducked around the inside corner, in the office over there." He was asked: "And after getting inside the office there, and ducking down in behind that corner, then what did you do? A. Well I stayed there for a little bit, *and I didn't know whether I could get up and get in front of the door again, or whether he would shoot at me again, or what.*" Emphasis supplied.

Appellant knew at whom the guard had shot, that clearly appears from his testimony.

Appellant then did get up and came into the deputy warden's office and Warden Powell was there as well as Myles and Lee Smart. It was then that Lee Smart handed him some shells and appellant knelt down and loaded the gun he had been carrying.

While the record does not pinpoint the exact time that the

shot was fired at the deputy warden, we can refer to such testimony as the record contains. Officer Cox testified that events commenced so far as he was concerned at about 3:30 p.m., and that the whole affair, which would include the shooting of the deputy warden, took about ten to fifteen minutes. Taking his longest estimate the deputy warden was shot by 3:45 p.m. John Simonsen arrived at the front gate of the Prison between 4:10 and 4:30 p.m., and after he had been taken hostage on his arrival inside he was taken to the deputy warden's office and saw Rothe on the floor. Simonsen called Warden Powell and requested him to come over to the Prison, all at the direction of the inmates who held him hostage. Warden Powell testified he first saw Alton come into the building between 4:45 and 5:00 p.m. Warden Powell heard the shot fired from the tower immediately before Alton came in the building carrying a rifle. Powell was asked: ''What occurred then? A. I was informed that if we didn't tell the tower guards not to shoot at anybody else, that someone was going to get killed, that is, that some one of us was going to be killed.'' The Warden then issued instructions as requested.

This record demonstrates that a period of at least one-half hour elapsed between the shooting of the deputy warden and the firing of a shot by the tower guard.

The petition for rehearing being without merit, it is hereby denied.

MR. JUSTICES ADAIR, CASTLES and JOHN C. HARRISON concur.